05-3260-ag
Pierre v. Gonzales

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: November 27, 2006    Decided: September 11, 2007)

Docket No. 05-3260-ag

- - - - - - - - - - - - - - - - - - - -X

FRANCK PIERRE,

Petitioner,

- v.-

ALBERTO R. GONZALES, Attorney General
of the United States; WILLIAM CLEARY,
Acting Field Director Deportation and
Removal, Buffalo District, Bureau of
Immigration and Customs Enforcement,
United States Department of Homeland
Security,

Respondents.

- - - - - - - - - - - - - - - - - - - -X

Before:      JACOBS, Chief Judge, WALKER, and RAGGI,
             Circuit Judges.

Petition for review of a final decision and order of

the Board of Immigration Appeals affirming an immigration

judge's denial of an application for withholding of removal

under the Convention Against Torture.

Petition denied.

MARK T. KENMORE, Buffalo, NY, for Petitioner.[1]

GAIL Y. MITCHELL, Assistant United States Attorney, for Terrance P. Flynn, United States Attorney for the Western District of New York, Buffalo, NY, for Respondent.

DENNIS JACOBS, Chief Judge:

Petitioner Franck Pierre, a native of Haiti, appeals from the June 15, 2004 final decision and order of the Board of Immigration Appeals ("BIA") which affirmed the January 20, 2004 decision of immigration judge ("IJ") John B. Reid denying Pierre's application for withholding of removal and relief under the Convention Against Torture ("CAT").

Pierre asserts that he has shown a sufficient likelihood that he will be tortured if he is deported to Haiti, because all Haitians who are deported from the United States (and other countries) for criminal conduct are imprisoned indefinitely, and because prison conditions prevailing in Haiti amount to torture. He challenges the

---

[1] Subsequent to oral argument, petitioner's counsel withdrew; having afforded the petitioner an opportunity to obtain new counsel and/or file supplemental briefing, and having received no such briefing, we decide the case on the original briefs and oral argument.

BIA's decision in In re J-E-, 23 I. & N. Dec. 291 (B.I.A. 2002) (en banc), which held that a Haitian petitioner faced with this detention is not entitled to CAT relief. He also contends that his case is distinguishable from In re J-E- because his medical conditions will be inadequately treated in the Haitian prisons.

We deny the petition, and defer to the BIA's interpretation of the definition of torture under the CAT regulations. The failure to maintain standards of diet, hygiene, and living space in prison does not constitute torture under the CAT unless the deficits are sufficiently extreme and are inflicted by government actors (or by others with government acquiescence) *intentionally* rather than as a result of poverty, neglect, or incompetence. We also affirm the agency's conclusion that, based on the record evidence, Pierre's diabetes does not remove his case from the ambit of In re J-E-.

## BACKGROUND

Pierre was born in Haiti in 1962, and was admitted to the United States in 1967. In August of 1997, Pierre was convicted of criminal possession of a firearm; in September

3

1999, he was convicted of grand larceny. For the latter crime, he was sentenced to a period of 18 to 36 months' incarceration.

In 2000, the INS charged that Pierre was subject to removal under 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien convicted of an aggravated felony, see 8 U.S.C. § 1101(a)(43)(G) (defining aggravated felony to include "a theft offense . . . for which the term of imprisonment [is] at least one year"), and under 8 U.S.C. § 1227(a)(2)(C) as an alien convicted of a firearms offense. Pierre conceded removability, but applied for withholding of removal and CAT relief. Before the IJ, he presented documentary evidence concerning the conditions in Haiti, as well as his own testimony and that of his sister--a doctor--concerning Pierre's diabetes.

The record concerning country conditions in this case is substantially similar to the record in In re J-E- (and its progeny), and can be summarized as follows.

At one time, Haitian government policy had been to briefly detain any Haitian deported for having committed crimes in another country; release was ordinarily secured within a week. In re J-E-, 23 I. & N. Dec. at 300. In

4

2000, Haiti began to hold such deportees with no timetable for their release.  According to a 2000 U.S. State Department country report (written in 2001), this policy was instituted to "prevent the 'bandits' from increasing the level of insecurity and crime in the country."  Id. (quoting Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, Haiti: Country Reports on Human Rights Practices-- 2000 (Feb. 23, 2001), available at http://www.state.gov/g/drl/rls/hrrpt/2000/wha/795.htm ("the 2000 Country Report")).

Conditions in Haitian prisons are awful.  "[P]rison facilities are overcrowded and inadequate. . . . [P]risoners are deprived of adequate food, water, medical care, sanitation, and exercise.  Many prisoners are malnourished."  Id. at 293.  A lack of basic hygiene and health care results in elevated morbidity and mortality.  Id.  According to the 2000 Country Report, food and medicine are in short supply, and prisoners receive one meal a day unless their diet is supplemented by nearby family.  Haitian prison authorities, working with the Red Cross, have attempted to improve conditions in the country's prisons.  Id. at 301.

The State Department reports that deliberate mistreatment of those arrested or detained by police in Haiti is "pervasive in all parts of the country," commonly involves "[b]eating with fists, sticks, and belts," and sometimes involves "burning with cigarettes, choking, hooding, and kalot marassa (severe boxing of the ears, which can result in eardrum damage)." Id. (quoting the 2000 Country Report).

At a January 7, 2004 hearing, Pierre's sister testified that her brother suffered from type two diabetes and from hypertension, though she herself (an emergency room physician with a pediatric specialty) had never treated him. According to her testimony, without his diabetes medications and a proper diet, Pierre's blood sugar levels would become unstable and acute dehydration could induce diabetic coma-- or even death. She also testified that Pierre's hypertension, if left untreated, could bring on a stroke.

Pierre himself testified as to the circumstances surrounding his criminal convictions and his connections with Haiti. Pierre's last visit to Haiti was in 1998, when he got married; his wife lives there with her family. As of the date of the 2004 hearing, he was corresponding with her

6

by mail.  He also testified that his aunt and uncle spend part of the year in Haiti and maintain a residence there.

In a January 20, 2004 decision, the IJ denied Pierre withholding of removal and CAT relief.  As to the CAT, (1) the IJ incorporated into his findings by reference the conclusion in In re J-E- that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering"; and (2) the IJ found (a) that Pierre's medications would be available in Haiti, (b) that his relatives in Haiti could supply him with medication, and (c) that he would neither be prevented from taking the medication nor be denied a fairly prompt release when his family took action.

Pierre appealed to the BIA both the denial of withholding of removal and the denial of CAT relief.  The BIA denied Pierre's appeal on June 15, 2004, declining to revisit In re J-E- and holding that because Pierre had failed to show that the substandard prison conditions in Haiti amounted to torture, or that his family would be prevented from giving him medication, he was not entitled to

7

relief under the CAT.[2] On July 15, 2004, Pierre filed a habeas petition in the Western District of New York; pursuant to provisions of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, § 106(c) (2005), the habeas petition was transferred to this Court as a petition for relief from a ruling of the BIA.

**DISCUSSION**

**I**

At issue in this case is a CAT regulation which

---

[2] The IJ evidently assumed--without analysis--that In re J-E- applied not only to the CAT but also to withholding of removal under 8 U.S.C. § 1231(b)(3); the BIA affirmed without an explanation of whether (or why) it adopted this assumption. But Pierre's brief to this Court addresses only the denial of CAT relief, and therefore Pierre has abandoned any challenge to the denial of withholding of removal under § 1231(b)(3). See Fen Yong Chen v. Bureau of Citizenship & Immigration Servs., 470 F.3d 509, 515 n.4 (2d Cir. 2006); Yueqing Zhang v. Gonzales, 426 F.3d 540, 542 n.1 (2d Cir. 2005). So we express no opinion on the matter. We also express no view on the IJ's conclusion that Haitian criminal deportees constitute a "particular social group" under the INA. See Toussaint v. Att'y Gen. of the U.S., 455 F.3d 409, 418 (3d Cir. 2006) (rejecting argument that Haitians who commit crimes in the United States constitute a particular social group); Elien v. Ashcroft, 364 F.3d 392, 397 (1st Cir. 2004) (same).

8

provides that "[i]n order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 208.18(a)(5). In re J-E- construed the phrase "specifically intended" to require a showing of specific intent. Pierre argues that the specific intent requirement of In re J-E- is an impermissible reading of the CAT and of the implementing regulations, and therefore is not entitled to deference. The CAT (according to Pierre) requires only general intent-- that is, the intent to commit an act that foreseeably results in severe pain or suffering.

Because Pierre is a criminal alien, this Court's review is limited to constitutional claims and questions of law. See 8 U.S.C. § 1252(a)(2)(C)-(D). "Except in cases where the IJ's factual findings are themselves based on constitutional or legal error--thus raising 'constitutional claims or questions of law'--[the Court] does not review the factual findings made by the IJ." Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 329 n.7 (2d Cir. 2006) (citing Joaquin-Porras v. Gonzales, 435 F.3d 172, 178-80 (2d Cir. 2006)). We review de novo the BIA's application of legal principles to undisputed facts. See Wangchuck v.

9

Dep't of Homeland Sec., 448 F.3d 524, 528 (2d Cir. 2006). But the BIA's interpretations of immigration regulations are reviewed with "'substantial deference.'" Id. (quoting Joaquin-Porras, 435 F.3d at 178).

The question as to the meaning of "torture" is presented to us now in the procedural and statutory context of immigration. But we bear in mind that (as this opinion demonstrates) the wording of the immigration regulations we read is carefully drawn to implement the wording of the CAT itself--subject to the express understandings of the Senate when it ratified--and that the CAT is not solely or predominantly concerned with immigration and refoulement.[3] The CAT binds its signatories to prevent torture within their own borders. Any definition of torture adopted by the United States has potential bearing on the obligations of the United States, domestically and abroad, in contexts that transcend our immigration laws. These considerations bear

---

[3] "Refoulement," as defined by the United Nations Educational, Scientific and Cultural Organization, is "the expulsion of persons who have the right to be recognised as refugees," whether to their country of origin or to another country in which they could be subjected to persecution. See UNESCO Migration Glossary, available at http://portal.unesco.org/shs/en/ev.php-URL_ID=4145&URL_DO=DO_TOPIC&URL_SECTION=201.html (last visited July 25, 2007).

10

upon our deference to the BIA's construction of the term "torture."  Great deference is owed to the political branches, which guide the nation's efforts to achieve (and define) domestic compliance and to coordinate with other countries in eradicating torture worldwide.  See El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty.").  The deference owed to the BIA may be qualified to the extent that its reading of the regulation (which mirrors the wording of the CAT and the Senate's understanding of it) is a reading of terms that have application outside the context of immigration.

**II**

**A**

The CAT, to which the United States is a signatory, includes a provision that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  United

11

Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Dec. 10, 1984, art. III, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114, available at http://www.unhchr.ch/html/menu3/b/h_cat39.htm.

Torture is defined by the CAT and the immigration regulations as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1); see also CAT art. 1. Torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 208.18(a)(3); CAT art. 1.

The CAT is not self-executing; by its own force, it confers no judicially enforceable right on individuals. See Mu-Xing Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003). To implement the CAT, Congress amended the immigration laws

12

with the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),[4] which announced the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  Pub. L. No. 105-277, Div. G, tit. XXII, § 2242(a), 112 Stat. 2681, 2681-822 (codified at 8 U.S.C. § 1231 note); see Auguste v. Ridge, 395 F.3d 123, 132-33 (3d Cir. 2005).  FARRA directed the appropriate agency (the Department of Justice) to issue implementing regulations, and specified that the regulations should define torture as the term is defined in the treaty "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention."  FARRA § 2242(b), (f)(2) (codified at 8 U.S.C. § 1231 note), quoted in 8 C.F.R. § 208.18(a); see Auguste, 395 F.3d at 133.  The definition of torture under domestic immigration law, and

---

[4] The CAT took some time to be implemented.  President Ronald Reagan signed the CAT on April 18, 1988, but the United States did not ratify the convention until October 21, 1994, see Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999), and FARRA followed in 1998.

13

the scope of an individual's entitlement to CAT relief, is therefore governed by the text of the CAT subject to the terms of the Senate ratification resolution.

The Senate ratification resolution included the following understanding: "[T]he United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering . . . ."  136 Cong. Rec. S17,486-01, S17,491 (1990); see also Convention against Torture, Declarations and Reservations, available at http://www.ohchr.org/english/countries/ratification/9.htm (last visited July 25, 2007).  The FARRA regulations use the wording of this understanding:  "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering."  8 C.F.R. § 208.18(a)(5).  One ramification of this, as the regulations explain, is that an act is not torture if it "results in unanticipated or unintended severity of pain and suffering." Id.

The text of the CAT itself recognizes that there are "other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture."  CAT art. 16.

The regulations also draw this distinction: "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2).

The acts of private individuals may constitute torture under the CAT only if there is government "acquiescence." See CAT art. 1. The Senate's resolution indicates:

> [T]he United States understands that the term "acquiescence" requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity.

136 Cong. Rec. S17,486-01, S17,491-92; see Khouzam v. Ashcroft, 361 F.3d 161, 170-71 (2d Cir. 2004) (discussing the U.S. government's decision to revise its original understandings "to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence'" (quoting S. Exec. Rep. 101-30, at 9 (1990))). The regulations incorporate the text of this understanding. See 8 C.F.R. § 208.18(a)(7).

The CAT forbids deportation if there are "substantial grounds" to believe that the deportee will suffer torture at home; the Senate Ratification Resolution links this standard

15

to the "more likely than not" standard used by immigration courts for persecution-based withholding of removal claims:

> [T]he United States understands the phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in Article 3 of the Convention, to mean "if it is more likely than not that he would be tortured."

136 Cong. Rec. S17,486-01, S17,492. Accordingly, the regulations place the "burden of proof . . . on the applicant for withholding of removal . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 208.16(c)(2), and mandate withholding or deferral of removal where the applicant meets this burden, 8 C.F.R. § 208.16(c)(4); see Mu Xiang Lin v. U.S. Dep't of Justice, 432 F.3d 156, 159 (2d Cir. 2005).


**B**

The issue in this case is whether Haiti's indefinite detention of criminal deportees amounts to torture in light of the prevailing prison conditions. The BIA answered this question in the negative in In re J-E-, 23 I. & N. Dec. 291 (B.I.A. 2002) (en banc), and the BIA here affirmed the IJ's denial of relief because Pierre's medical condition does not

16

distinguish his case from In re J-E-.

In re J-E- held (1) that detaining criminal deportees in the prison conditions prevailing in Haiti does not constitute torture because the prison conditions are not created or maintained with a specific intent to cause severe pain and suffering, but are instead "the result of budgetary and management problems as well as the country's severe economic difficulties," id. at 301; and (2) that indefinite detention does not amount to torture because it is a lawful sanction, id. at 300. The BIA conceded that there are examples of "isolated acts" constituting torture in Haitian prisons, but concluded that the applicant there presented insufficient evidence to show it was more likely than not that he would be singled out for such treatment. Id. at 303-04.

Pierre argues that the specific intent standard of In re J-E- is an impermissible narrowing of the CAT, and is therefore not entitled to deference. However, the regulations at issue were drawn by the DOJ pursuant to a mandate in FARRA to craft regulations that implement the exact wording of the Senate's expressed understanding of a treaty. On general principles, this circumstance bespeaks

17

more deference, not less: deference to the Senate's ratification understanding, deference to the framing of the regulations, and deference to an agency's interpretation of the regulations. "[I]n construing treaty language, '[r]espect is ordinarily due the reasonable views of the Executive Branch.'" Tachiona v. United States, 386 F.3d 205, 216 (2d Cir. 2004) (second alteration in original) (quoting El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999)); see also Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). As to the CAT regulations: where the BIA interprets "a regulation promulgated by the Attorney General under the INA, we afford 'substantial deference' to the BIA's interpretation, unless it is plainly erroneous or inconsistent with the regulation, or inconsistent with the agency's previous interpretation." Zhen Nan Lin v. U.S. Dep't of Justice, 459 F.3d 255, 262 (2d Cir. 2006) (citations omitted).

Deference to the BIA's interpretation of the CAT is particularly important when (as here) "claims similar to

18

[the petitioner's] have been advanced by many petitioners before this and other courts," and the issue "raises complicated public policy and foreign policy questions." Jian Hui Shao v. BIA, 465 F.3d 497, 502 (2d Cir. 2006) (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.")).

## C

The BIA's decision in In re J-E- has commanded deference from several federal courts. See, e.g., Theagene v. Gonzales, 411 F.3d 1107, 1113 (9th Cir. 2005); Auguste, 395 F.3d at 153; Cadet v. Bulger, 377 F.3d 1173, 1193 (11th Cir. 2004); Elien v. Ashcroft, 364 F.3d 392, 399 (1st Cir. 2004); Thelemaque v. Ashcroft, 363 F. Supp. 2d 198, 211 (D. Conn. 2005). No federal circuit court considering the case of a Haitian criminal deportee has declined to follow In re J-E-, though there are wrinkles in the Third Circuit.[3]

---

[3] In Lavira v. Att'y Gen. of the U.S., 478 F.3d 158 (3d Cir. 2007), the Third Circuit remanded such a case, but not because it rejected the validity of In re J-E-. Rather, the

19

In the case of a Congolese petitioner, the Third Circuit distinguished In re J-E- on the basis that the petitioner's CAT claim was based on far more than evidence of substandard prison conditions.  See Zubeda v. Ashcroft, 333 F.3d 463 (3d Cir. 2003).[4]  The Zubeda panel also opined that the wording of the CAT regulations stopped short of requiring specific intent.  But this discussion in Zubeda was discounted as dicta in a later Third Circuit case that decided the very issue before this Court--and followed In re J-E-.  See Auguste, 395 F.3d at 147-48.  Of course, we are free nevertheless to adopt Zubeda's analysis as persuasive, but we are unpersuaded for the following reasons.

Zubeda concluded that (under the statute and

_____

Third Circuit held that the agency had failed to properly consider whether the petitioner's individual circumstances made his case distinguishable from In re J-E-.

[4] The Zubeda panel noted that the BIA had ignored record evidence,

> [r]educing Zubeda's claim to an attack on . . . inhumane prison conditions . . . [which] totally ignores the fact that this record is replete with reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder [in the Democratic Republic of the Congo].

333 F.3d at 477.

20

regulations) torture does not entail a specific intent to inflict severe pain or suffering.[5]  The panel acknowledged that severe pain and suffering must be "specifically intended" to constitute torture; but to justify its conclusion that one can "specifically intend" without specific intent, the panel focused on the regulations' statement that an "'act that results in unanticipated or unintended severity of pain and suffering is not torture.'" Zubeda, 333 F.3d at 473-74 (quoting 8 C.F.R. § 208.18(a)(5)).  As a matter of plain language, we read that portion of section 208.18(a)(5) differently to draw a distinction between a severity of pain or suffering that is intended (torture) and a severity of pain or suffering that is unintentional or unanticipated (not torture), rather than a distinction between what is foreseeable and what is not. The proviso in section 208.18(a)(5) that an act must be "specifically intended to inflict severe physical or mental pain or suffering" bespeaks specific intent, the Zubeda

---

[5]  This runs counter to the ordinary understanding of the word "torture"; but the Zubeda panel considered the issue in a context--rape--that presents special difficulties if (though only if) one thinks that the intent of a rapist is satisfaction that does not depend on the pain inflicted on the victim.

21

dicta notwithstanding.

Zubeda discounted specific intent on another ground: that the CAT regulations define torture to include threats of physical harm that result in severe mental suffering, regardless of whether the persecutor actually intends to carry out the threat. Zubeda, 333 F.3d at 474. But this proves little; when a credible threat of physical torture causes extreme mental pain or suffering, the specific intent requirement is altogether satisfied by the specific intent to cause the mental pain or suffering; the persecutor's intent (specific or not) to follow through on the threat to inflict physical torture does not matter if the making of the credible threat amounts to the torture in itself. See 8 C.F.R. § 208.18(a)(4) (defining types of severe mental pain and suffering that can rise to the level of torture with or without any physical torture).

It is also important that the concept of specific intent not be conflated with the concept of state acquiescence. Because the CAT reaches torture committed by or acquiesced in by government actors, it is not always necessary that the specific intent required by section 208.18(a)(5) be formed by the government itself. A private actor's behavior can

22

constitute torture under the CAT without a government's specific intent to inflict it if a government official is aware of the persecutor's conduct and intent and acquiesces in violation of the official's duty to intervene.  See Khouzam v. Ashcroft, 361 F.3d 161, 171 (2d Cir. 2004) ("In terms of state action, torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it." (emphasis added)).  But in that scenario, there is specific intent--the intent of the private actor.

Some courts have contemplated the possibility that in particular cases, a government's "willful blindness" or "deliberate indifference" to suffering might suffice to show that the suffering is "specifically intended."  See, e.g., Lavira v. Att'y Gen. of the U.S., 478 F.3d 158, 171 (3d Cir. 2007) ("Our criminal law jurisprudence . . . bolsters the view that a finding of specific intent could be based on deliberate ignorance or willful blindness."); Thelemaque, 363 F. Supp. 2d at 215 ("[A] mechanical application of the specific intent requirement might yield results at odds with . . . CAT and . . . concepts such as deliberate indifference, reckless disregard or willful blindness might well suffice in

23

certain circumstances . . . .").  We do not see how these concepts, which may bear on knowledge to the extent they establish conscious avoidance, can without more demonstrate specific intent, which requires that the actor intend the actual consequences of his conduct (as distinguished from the act that causes these consequences).[6]

In sum, the phrase "specifically intended" incorporates a criminal specific intent standard, notwithstanding the difficulties that might arise in applying that standard to evidence of country conditions in order to predict the likelihood of future events in individual cases.  The President and Senate knew full well that they were construing a treaty designed to stop criminal conduct.[7]  We cannot

---

[6] That said, nothing in this opinion prevents the agency from drawing the inference, should the agency choose to do so, that a particular course of action is taken with specific intent to inflict severe pain and suffering if it is found on the record evidence that the actor is aware of a virtual certainty that such pain and suffering will result.

[7] The federal criminal statute--like the CAT regulations--requires that the infliction of severe pain and suffering be "specifically intended."  18 U.S.C. § 2340(1).  As other courts have noted, the George H.W. Bush administration, which proposed the understandings that the Senate adopted by resolution in 1990, clearly interpreted the understanding to require specific intent: "'[T]he package now contains a revised understanding to the definition of torture, which . . . maintains our position that <u>specific intent is required for torture</u>.'"  <u>Thelemaque</u>,

24

ignore the word "specifically" in the ratification understanding and the regulations, and we decline to give it a counter-intuitive spin. See Duncan v. Walker, 533 U.S. 167, 174 (2001) (citing principle that "'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting Market Co. v. Hoffman, 101 U.S. 112, 115 (1879))). The deference we owe to the BIA's analysis in In re J-E- simply confirms the understanding we derive from plain meaning. The BIA's reading of 8 C.F.R. § 208.18(a)(5), to which we defer, raises no insurmountable obstacle to CAT relief, because there is no requirement that a CAT claimant "provide direct proof of [the] persecutors' motives." INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992). The CAT regulations, like the asylum regulations, "make[] motive critical," so a CAT claimant must "provide some evidence" of specific intent, "direct or circumstantial." Id. But torture as commonly understood and practiced is not subtle, elusive, or easy to misconstrue, and the torturer's

---

363 F. Supp. 2d at 207 (emphasis added) (omission in original) (quoting S. Exec. Rep. No. 101-30, app. A at 35 (1990)).

intentions are rarely if ever obscure.[8]

**D**

Pierre appears to argue that even if the United States's ratification understanding reflects a definition of torture that entails a specific intent to inflict severe pain and suffering, it should yield to the broader language of the CAT itself as interpreted under principles of international law.

Because the CAT is not a self-executing treaty, Mu-Xing Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003), Pierre has no judicially enforceable right directly arising from the CAT as interpreted by its signatory nations: his claims arise under United States law implementing the treaty. See Flores v. S. Peru Copper Corp., 414 F.3d 233, 257 n.34 (2d Cir. 2003) (noting that non-self-executing treaties require

---

[8] An act is only torture under the CAT if it is motivated by some illicit purpose such as "obtaining . . . information or a confession, punishing . . ., or intimidating or coercing . . ., or for any reason based on discrimination of any kind . . . ." 8 C.F.R. § 208.18(a)(1); see Auguste, 395 F.3d at 151. Evidence showing an illicit purpose may easily overlap with evidence showing a specific intent to inflict severe pain or suffering. The issue of specific intent is isolated in this case only because imprisonment is by its nature designed to punish, but ordinarily does not trigger severe pain or suffering as contemplated by the CAT.

implementing action in order to be suitable for judicial application, while self-executing treaties immediately create judicially enforceable rights). "United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both." United States v. Yousef, 327 F.3d 56, 91 (2d Cir. 2003). An act of Congress will govern in domestic courts in derogation of previous treaties and customary international law. See Oliva v. U.S. Dep't of Justice, 433 F.3d 229, 236 (2d Cir. 2005) (noting that clear congressional action trumps customary international law in the immigration context as elswhere); Empresa Cubana Del Tabaco v. Culbro Corp., 399 F.3d 462, 481 (2d Cir. 2005) ("[L]egislative acts trump treaty-made international law when those acts are passed subsequent to ratification of the treaty and clearly contradict treaty obligations." (internal quotation marks omitted)); Mu-Xing Wang, 320 F.3d at 142 n.18; Guzman v. Tippy, 130 F.3d 64, 66 (2d Cir. 1997) (per curiam).

In that light, international law does not assist the analysis. It is plain that in FARRA, Congress commanded the immigration agencies to promulgate regulations that give full

27

effect to all of the Senate's reservations and understandings, including the understanding that in order to constitute torture, an act must be specifically intended to inflict severe pain and suffering. See Auguste, 395 F.3d at 140 ("[I]n our opinion, FARRA codified the Senate's understandings into domestic law."). By announcing its understandings, the Senate implicitly recognized that the treaty wording would benefit from clarification. Those understandings are the indispensable premise for the implementation of the CAT as domestic law. The agency is bound by them, and we defer to the agency's reasonable interpretation of them:

> [The petitioner] invites this Court to inquire into the meaning of Article 1 of the [CAT], its drafting history, and the interpretation of Article 1 by various international tribunals. . . . We, however, see no reason to be drawn into a debate about the appropriate interpretation . . . , or what the prevailing international understanding of the intent standard required under Article 1 of the [CAT] is. . . . [W]e believe that we must apply the standard clearly stated in the ratification record of the United States.

Id.

As we stated earlier, the CAT is not solely concerned with immigration and refoulement; the same language that governs the BIA's review of deportation orders guides the

political branches in their decisions about whether our country and other signatories are in compliance with a multilateral treaty.  It is unseemly for a government to adopt different meanings of the same word in the same treaty; and it is imprudent for a court to fix on a special or unnatural meaning in litigation when the political branches are evidently disposed otherwise.

**E**

Pierre also challenges the ruling in In re J-E- that Haiti's policy of indefinite detention is a "lawful sanction."  See 8 C.F.R. § 208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.").  Because we agree with the BIA that the regulations validly promulgated pursuant to FARRA clearly require a showing of specific intent to inflict severe pain and suffering, we need not decide the question of lawful sanction.

Nevertheless, a close reading of In re J-E- shows that while the BIA decided that the "detention policy in itself" was a "lawful sanction," 23 I. & N. Dec. at 300, it did not

29

decide whether conditions of confinement, lawfully imposed,[9] are categorically "lawful sanctions" that therefore cannot amount to torture. In holding that the Haitian prison conditions did not constitute torture, the BIA relied on the lack of specific intent, not on the "lawful sanctions" provision. Id. at 300-01. In any case, this Court has already narrowly construed In re J-E- on this point. See Khouzam, 361 F.3d at 169-70 ("It would totally eviscerate the CAT to hold that once someone is accused of a crime it is a legal impossibility for any abuse inflicted on that person to constitute torture. . . . If J-E- actually stood for this proposition, we would have to disapprove of it . . . ."). Moreover, one United States understanding of the CAT reflects Senate concern that the "lawful sanctions" language may be too expansive. See 136 Cong. Rec. S17,486-01, S17,491 ("[T]he United States understands that a State Party could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture."); Kyaw Zwar Tun v. INS, 445 F.3d 554, 567 (2d Cir. 2006) ("In accord with the Senate's understanding, even torture sanctioned by the

_____

[9] We do not address the legality of Haiti's detention policy under Haitian law.

30

alien's country of origin for his criminal conduct will sometimes establish entitlement to relief.").

Prison is always an ordeal.  Barbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering (over and above the discomforts incident to confinement in that time and place) is to illicitly discriminate, punish, coerce confessions, intimidate, or the like--just as live burial would be torture even if somewhere it were the lawful sanction for an offense.

Although we do not follow In re J-E- on the issue of lawful sanction, we defer to In re J-E-'s interpretation of 8 C.F.R. § 208.18(a)(5):  The failure to maintain standards of diet, hygiene, and living space in prison does not constitute torture under the CAT unless the deficits are sufficiently extreme and are inflicted intentionally rather than as a result of poverty, neglect, or incompetence.

**III**

The IJ and the BIA concluded that the medical evidence

31

Pierre adduced did not command a result different from that in In re J-E-. There is no reason to disturb the agency's decision.

Because Pierre is a criminal alien, we have no jurisdiction to review the agency's factual findings. See supra Section I. Therefore, unless the agency's fact-finding process was premised on legal error, we cannot question its findings about prevailing conditions in Haiti or the likelihood that specific events will occur when Pierre is returned to Haiti. It is beyond our power to revisit the conclusion in In re J-E---and the IJ's opinion--that prison conditions in Haiti chiefly result from economic conditions in that country and not from the intent on the part of the authorities to worsen the suffering of inmates or detainees. We also cannot question the IJ's finding that Pierre will likely have access to medicine through his family and will likely be released in a timely fashion. However, we do review, de novo, the agency's application of the definition of torture to its factual findings about what is likely to happen.

As we have held: Assuming the validity of the factual findings underlying In re J-E-, that decision reaches the

32

correct conclusion as to whether deportees' indefinite detainment constitutes torture.  Even though Haiti's government does apparently wish to intimidate criminal deportees by imprisoning them in whatever prisons are available, the agency found that neither the government nor its agents have any specific intent to cause severe suffering through harsh conditions as an additional means of intimidation--the poor conditions result chiefly from the economic situation in Haiti.  Therefore, imprisonment in Haiti without more is not torture.

As to Pierre's attempt to distinguish his case from In re J-E- on the basis of his medical condition, the IJ appeared to opine in passing that as to the issue of specific intent, Pierre's condition was irrelevant.  We disagree to the extent this suggests that a petitioner's individual circumstances are per se irrelevant under In re J-E- and can have no bearing on the likelihood that the petitioner would be subjected to torture.  It is true that, given the United States's understandings of the CAT, even suffering of the utmost severity cannot constitute torture unless it is specifically intended, and this principle undercuts the importance of evidence that a particular petitioner's

33

suffering in prison will be more severe or more foreseeable than others'; but it does not render such evidence irrelevant.  Nothing in In re J-E- or in our opinion dictates that a petitioner cannot present evidence that the severe suffering to which the petitioner is likely to be subjected is motivated by some actor's specific intent--that is, some intent not present in In re J-E-.[10]  As In re J-E- acknowledged, acts of abuse committed by prison guards are

---

[10] In Lavira v. Attorney General of the United States, a panel of the Third Circuit remanded the case of an HIV-positive Haitian criminal alien because both the IJ and the BIA summarily relied on In re J-E- and failed to "focus[] on the specifics of [the petitioner's] situation in denying his CAT claim."  478 F.3d 158, 171 (3d Cir. 2007).  The Lavira panel purported to further hold that Lavira had a "non-frivolous and legally available" argument that the extremely high likelihood of an HIV-positive petitioner's death in Haitian prison meant that any Haitian official who detained such a petitioner would exhibit "willful blindness" to the likelihood of death; the panel reasoned that this would adequately show specific intent.  Notwithstanding assertions to the contrary in Lavira, this proposition seems to us inconsistent with the Third Circuit's holding in Auguste that "[t]he mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities intend to inflict severe pain and suffering."  395 F.3d at 153-54.  How can willful blindness towards a fact be legally significant if actual knowledge of it is not?  To the extent the two cases are in tension, Auguste is the more persuasive precedent, though it is hard to contest Lavira's chief holding: IJs should carefully consider evidence that individual petitioners put forth to distinguish their cases from In re J-E-.  That is what the IJ did here.

34

not infrequent in Haiti, and it might be that petitioners with certain histories, characteristics, or medical conditions are more likely to be targeted not only with these individual acts but also with particularly harsh conditions of confinement. But Pierre adduced no evidence suggesting this to be the case as to diabetics or as to him individually.

Even though the IJ arguably overstated the impact of In re J-E- on the relevance of Pierre's medical condition, the record indicates that the IJ carefully considered Pierre's evidence and entered individualized findings that adequately support the conclusion that, notwithstanding Pierre's medical condition, Pierre has not adduced the evidence that he will likely be subjected to torture. The BIA affirmed on that basis, and so do we.

**CONCLUSION**

For the foregoing reasons, the petition is denied.