*Andrade v. Bondi*

BIA
Schultz, IJ
A094 476 777

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of January, two thousand twenty-six.

PRESENT:
>JON O. NEWMAN,
>GERARD E. LYNCH,
>SARAH A. L. MERRIAM,
>>*Circuit Judges.*

_____

JORGE ALBERTO ANDRADE,
>*Petitioner*,

>v.                                                          24-2806
>                                                            NAC

PAMELA BONDI, UNITED STATES
ATTORNEY GENERAL,
>*Respondent.*

_____

FOR PETITIONER:            Aaron J. Aisen, Michaela Andriatch, Erie County Bar Association Volunteer Lawyers Project, Batavia, NY.

**FOR RESPONDENT:** Brett A. Schumate, Assistant Attorney General; Margot P. Kniffin, Rebecca Hoffberg Phillips, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, Washington, DC.

UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is GRANTED, the removal order is VACATED, and the case is remanded for further consideration consistent with this order.

Petitioner Jorge Alberto Andrade, a native and citizen of El Salvador, seeks review of an October 23, 2024, decision of the BIA affirming a May 6, 2024, decision of an Immigration Judge ("IJ") denying Andrade's application for protection under the Convention Against Torture ("CAT"). *In re Andrade*, No. A 094 476 777 (B.I.A. Oct. 23, 2024), *aff'g* No. A 094 476 777 (Immig. Ct. Batavia May 6, 2024). We assume the parties' familiarity with the underlying facts and procedural history.

We review the IJ's decision as supplemented by the BIA. *See Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). We review findings of fact for substantial evidence and questions of law and application of law to fact de novo. *See Quintanilla-Mejia v. Garland*, 3 F.4th 569, 583 (2d Cir. 2021). "[T]he

2

administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "[W]e presume that [the agency] has taken into account all of the evidence before [it], unless the record compellingly suggests otherwise." *Xiao Ji Chen v. U.S. Dep't of Just.*, 471 F.3d 315, 336 n.17 (2d Cir. 2006). However, remand is warranted if the agency "overlook[s] key evidence and mischaracterize[s] the record," *Doe v. Sessions*, 886 F.3d 203, 211 (2d Cir. 2018), or where there is insufficient reasoning for judicial review, *see Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005).

A CAT applicant must show he will "more likely than not" be tortured "if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture is . . . any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." *Id.* § 1208.18(a)(1). The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured." *Chun Gao v. Gonzales*, 424 F.3d 122, 128–29 (2d Cir. 2005) (quotation marks omitted). Whether an applicant meets this threshold "must be considered in terms of the aggregate risk of torture from all

3

sources, and not as separate, divisible . . . claims." *Matter of J-R-G-P-*, 27 I. & N.

Dec. 482, 484 (B.I.A. 2018) (quotation marks omitted).

The agency found that, while Andrade would likely be detained under the

state of exception,[1] he had not established likely torture by Salvadoran officials

because (1) the risk of intentional torture by prison guards, police, or other officials

was speculative as there were only anecdotal reports of torture, (2) there was

insufficient evidence that pain and suffering caused by prison conditions would

be intentionally inflicted, and (3) the record did not demonstrate that officials

would acquiesce to Andrade's torture by other incarcerated gang members. As

discussed below, we remand because the agency did not address all evidence

relevant to the risk of torture by prison officials or to the intentional imposition of

harsh prison conditions. We find no error in the agency's determination that

Andrade did not demonstrate that he would more likely than not be tortured by

rival gang members with the acquiescence of public officials.

## I.      Torture by Salvadoran Prison Officials

Andrade's expert witness, Dr. Robert Kirkland, stated:

---

1 The "régimen de excepción" or state of exception, enacted in March 2022, is a national law of El Salvador under which known or suspected gang members may be arrested and imprisoned with little process. *See* Certified Administrative Record ("CAR") at 310 (2022 State Dep't Rep.)

> The extreme violence in Salvadoran prisons is a matter of state-sanctioned policy and practice. Guards and police beat detainees to try to force them to "confess" to gang membership, in addition to beating and punishing detainees simply to inflict pain and suffering. Many prisoners have died while in state custody under circumstances that suggest torture and abuse as the cause of death, such as death certificates that list "mechanical asphyxia," "multiple unidentified traumas," or "badly beaten" as the principal cause of death . . . [and] Amnesty International and others have suggested that the prison conditions in El Salvador amount to "a policy of systematically torturing everyone who is detained under the state of emergency because they are suspected of being gang members."

CAR at 294 (Kirkland Aff.); *see also id.* at 316 (2022 State Dep't Rep.) (reporting 35 detainee deaths from "causes such as strangulation, blunt force trauma, or other causes that could indicate torture or mistreatment"), 367 (2023 Amnesty Int'l Art.) (reporting "deaths of 190 individuals while in state custody—some as a result of torture or other ill-treatment"), 389 (2022 Intercept Art.) ("[T]he few people released from prisons—mostly minors—have shown signs of being beaten, starved, and medically neglected. Some have shown signs of torture."), 403 (2023 El Pais Art.) (reporting "death[s] of 153 prisoners" and noting "a 'common pattern' [of] the presence of lacerations, hematomas caused by beatings, wounds with sharp objects and signs of choking or strangling on the cadavers"), 444 (2024 AP Art.) (reporting that 241 people died in prison since the start of the state of exception).

5

Evidence further indicates that prisoners have been deprived of food and water and arbitrarily subjected to electric shocks, humiliation, confinement in isolation cells without cots or toilets, and beatings. *Id.* at 406–07 (2023 El Pais Art.) (released detainee describing how guards gave him five seconds to eat off the floor with only his mouth), 411 (2023 El Faro Art.) ("One man suffered electric shocks while being forced to kneel on gravel to the point that he began bleeding. Another suffered a stroke after he was held in solitary confinement, given only one meal a day, and subjected to routine beatings. In another case, around 145 people confined to one cell were forced to share a single glass for water, and to eat off of the floor."), 553 (2023 State Dep't Rep.) (relating reports of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks. . . . [G]uards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.").

The agency appeared to assume that these instances of severe violence would qualify as intentional torture. *See* 8 C.F.R. § 1208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," but lawful sanctions "do not include sanctions that defeat the object and purpose of the [CAT] to prohibit torture."); *Pierre v. Gonzales*, 502 F.3d 109, 121

6

(2d Cir. 2007) (noting that punishments such as "live burial" qualify as torture "even if somewhere it were the lawful sanction for an offense"). No evidence suggests that a legitimate penological purpose was served by the extreme and arbitrary punishments employed by Salvadoran prison guards, such as electric shocks, strangulation, lethal beatings, and the like. *Cf. Galina v. Wilkinson*, 988 F.3d 137, 142–43 (2d Cir. 2021) (Italian solitary confinement policy was not intended as torture where legitimate penological purpose—prevention of crimes organized from prison—was served). The prison guards perpetrating these acts are public officials, so their conduct satisfies the state action element of a CAT claim. *See* 8 C.F.R. § 1208.18(a)(1). Accordingly, the issue with respect to these intentional abuses is whether Andrade established he is more likely than not to be subjected to such torture.

The agency concluded that the evidence of direct torture was "[a]necdotal," encompassing less than the majority of gang members incarcerated under the state of exception, and therefore insufficient to establish likely torture. CAR at 4. However, the agency did not discuss Dr. Kirkland's conclusion that torture by prison guards is a matter of policy. *See* CAR at 294–95; *see also id.* at 403 (2023 El Pais Art.) ("The massive and systemic violations are now a state policy."). In

7

addition, nearly all data about Salvadoran prisons during the state of exception comes from reviewing reports of detainees who have died and the statements of those released, but the record shows that both categories represent only a small percentage of the total detainee population. *See, e.g., id.* at 294, 316, 389, 403. Thus, the evidence implies violence at higher rate than the agency contemplated. *See id.* at 403 (identifying indications of torture in deaths of 75 detainees out of 153 deaths reviewed), 445 (2024 AP Art.) (reporting NGO's conclusion that 44% of deaths were due to violence, plus 29% due to lack of medical attention). An inference of systemic torture is further supported by evidence that the Salvadoran government restricted access to prisons and engaged in cover-ups regarding the existence of torture. *See, e.g., id.* at 316 (2022 State Dep't Rep.) (explaining that Salvadoran human rights agency (PDDH) was denied access to prisons in November 2022), 377 (2024 Amnesty Int'l Art.) (citing a "pattern of minimization, concealment, delegitimization and denial adopted by the government of El Salvador"), 389 (2022 Intercept Art.) (describing how new laws restrict lawyers and independent media from accessing prisons), 402 (2023 El Pais Art.) ("Authorities have withheld official information and have insisted that all deaths within prisons are from natural causes."). While an absence of evidence normally

8

works against the party bearing the burden of proof (here, Andrade), this evidence that the Salvadoran government has limited information regarding rates of torture bolsters, rather than diminishes, the overall likelihood of torture. *See Villalta Martinez v. Bondi*, 157 F.4th 108, 117–18 (2d Cir. 2025) (holding that BIA erred in relying on lack of complete information regarding prison conditions to reverse an IJ's finding of likely torture by Salvadoran government, given evidence of data suppression).

The IJ cited the 2023 State Department Report for the proposition that "[t]he government took credible steps to identify and punish officials who may have committed human rights abuses." CAR at 549. However, the agency did not acknowledge that the report also implies that those steps did not extend to prison officials: "Impunity was a problem in the General Directorate of Penal Centers particularly for prison guards. Human rights organizations noted the Attorney General's Office had not opened any complaints into the allegations of torture, abuse, or mistreatment by prison guards." *Id.* at 554; *see also id.* at 311 (2022 State Dep't Rep.) ("Impunity persisted in the security forces, other executive branch offices, and justice system."); *see Doe*, 886 F.3d at 211 (remanding where agency failed to acknowledge or assess evidence contrary to its conclusion).

9

In sum, we do not opine as to whether the record establishes that Andrade has a 50% or greater chance of being tortured by prison officials, but we conclude that the record at least shows more than isolated incidents as found by the agency. We remand for the agency to determine in the first instance and based on the totality of the evidence whether the aggregate risk of torture—from prison officials and from harsh prison conditions—rises above the threshold. *See Doe*, 886 F.3d at 211; *Matter of J-R-G-P-*, 27 I. & N. Dec. at 484.

## II.    Prison Conditions

"Torture does not include pain or suffering arising only from, inherent in, or incidental to lawful sanctions," unless such sanctions "defeat the object and purpose of the [CAT] to prohibit torture."  8 C.F.R. § 1208.18(a)(3).  "[B]arbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering . . . is to illicitly discriminate, punish, coerce confessions, intimidate, or the like."  *Pierre*, 502 F.3d at 121.  "The failure to maintain standards of diet, hygiene, and living space in prison does not constitute torture under the CAT unless the deficits are sufficiently extreme and are inflicted intentionally rather than as a result of poverty, neglect, or incompetence."  *Id.*;

10

*accord Matter of J-R-G-P-*, 27 I. & N. Dec. at 485–86.   Thus, to show torturous prison conditions, "a CAT claimant must provide *some* evidence of specific intent, direct or circumstantial."   *Pierre*, 502 F.3d at 119 (quotation marks omitted).

The IJ found that, "to the point of near certainty," Andrade would be imprisoned upon removal to El Salvador and face "cruel, inhuman, and degrading" treatment.   CAR at 73, 75.   The issue is whether the IJ erred in concluding that Andrade did not produce any evidence that those conditions were intended to cause pain and suffering to suspected gang members.

The 2022 State Department report states that El Salvador's prisons were at "119 percent of capacity *prior* to the state of exception but became more crowded as the number of detainees doubled.   By May [2022], more than 71,000 detainees were being held in a penitentiary system designed for 30,000."   *Id.* at 315.   In some instances, as many as "80 prisoners [were] held in cells built for 12," *id.*, and released prisoners reported "shar[ing] a cell with no toilet—just a bucket—with 400 others," *id.* at 398.   The Salvadoran government was aware of this situation, releasing photos showing prisoners held shoulder-to-shoulder, *see, e.g., id.* at 371, 395, 402, 404, 421, and advertising it as what the gang members deserve, *id.* at 315 (2022 State Dep't Rep.) ("From the start of the state of exception, the government

11

frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members."). This constitutes some evidence that overcrowding was intentional punishment, rather than the result of limited resources or neglect. *Cf. Pierre*, 502 F.3d at 121.

Likewise, the statements of government officials provide evidence that the severe limits on detainees' food and water were, at least in part, intentional. *See, e.g.*, CAR at 315 (2022 State Dep't Rep.) ("A released prisoner reported he received four ounces of rice and one tortilla per day."), 387 (Intercept Article) ("[F]ood rations for prisons are meager, unvaried, and inconsistent), 555 (2023 State Dep't Rep.) ("Detainees . . . reported a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day."). One article describes how, following an incident of gang violence outside of the prisons, President Bukele "threatened to stop feeding prisoners at all," saying, "I swear to God, they won't eat a grain of rice, and let's see how long they last." *Id.* at 387.

This evidence, together with that discussed above of arbitrary violence inflicted on some detainees by guards, raises an inference that the Salvadoran government created or allowed severe prison conditions with a specific intent to

cause pain and suffering to those incarcerated under the state of exception. Additionally, unlike with violence by the guards, no evidence suggests that steps have been taken to alleviate food and water deficiencies. *See id.* at 549–92 (2023 State Dep't Rep.). And while the 2023 State Department report indicates that a new, high-capacity prison facility was completed, the same passage indicates that it was under-utilized and that overcrowding persisted. *See id.* at 555.

The IJ did not address this evidence in finding no or insufficient evidence of intent to torture. *See id.* at 72–75. And although on appeal, Andrade pointed to evidence of intent, including Dr. Kirkland's statements, the social media comments of Salvadoran officials, and the severity of the conditions, the BIA did not address it. *See id.* at 3–4 (BIA Dec.), 21–24 (Br. to BIA). To the extent the BIA spoke to the likelihood of torture (which presumes intent) through imposition of harsh prison conditions, it mischaracterized the record by chalking the evidence up to "generalized reports" of ordinary prison brutality. *Id.* at 4. Thus, we remand for the agency to determine whether the evidence, properly considered, establishes that the prison conditions should be included in Andrade's aggregate risk of torture. *See Doe*, 886 F.3d at 211; *Matter of J-R-G-P-*, 27 I. & N. Dec. at 484.

### III. Torture by Imprisoned Rival Gang Members

Andrade also asserted a risk of torture by rival gang members in prison. Torture by private actors may be attributable to the government, and thus fall under the CAT's definition of torture, if a government official consents or acquiesces to the torture. *See* 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity. Such awareness requires a finding of either actual knowledge or willful blindness." *Id.* § 1208.18(a)(7).

We find no error in the IJ's lack of discussion of this risk because, as the IJ's summary of the evidence reflects, the record does not suggest that inter-gang violence is condoned or tolerated by prison officials. *See, e.g.*, CAR at 72–73 (IJ's decision summarizing evidence of steps taken to separate rival gangs in prison), 220 (Tr.) ("[Officials] try to separate the gang members by their affiliations."), 316 (2022 State Dep't Rep.) ("[P]risoners were divided into groups composed of gang members, gang collaborators, and those with no gang connections."); *see also Jian Hui Shao v. Mukasey*, 546 F.3d 138, 169 (2d Cir. 2008) (explaining that agency has "duty explicitly to consider *relevant* evidence" but that agency need not "expressly

parse or refute on the record each individual argument or piece of evidence offered by the petitioner" (emphasis added; quotation marks omitted)). Andrade raised this fear on appeal, but did not identify evidence to support it. The BIA's conclusion that Andrade's unsupported claim was speculative was not impermissible fact-finding, particularly in light of the IJ's acknowledgement of the evidence that gang members were separated.

As set forth above, the petition for review is GRANTED, the removal order is VACATED, and the case is REMANDED for further consideration of country conditions evidence relevant to the likelihood of torture by officials in prison and whether the inhumane prison conditions—including overcrowding and deprivations of food and water—are intentional and rise to the level of torture. All pending motions and applications are DENIED as moot.

<div style="margin-left: 45%;">
FOR THE COURT:<br>
Catherine O'Hagan Wolfe,<br>
Clerk of Court
</div>