No. 18-67-ag
*Quintanilla v. Garland*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 18-67

RICARDO QUINTANILLA-MEJIA,
AKA RICARDO ELIUD QUINTANILLA-MEJIA,
*Petitioner*,

v.

MERRICK B. GARLAND, United States Attorney General,
*Respondent*.

On Appeal from the Board of Immigration Appeals

ARGUED: MARCH 1, 2021
DECIDED: JULY 9, 2021

Before: CABRANES, RAGGI, and SULLIVAN, *Circuit Judges*.

Ricardo Quintanilla-Mejia petitions for review of a Board of Immigration Appeals ("BIA") decision denying his application for statutory withholding of removal and protection under the Convention Against Torture ("CAT"). Petitioner faults the agency for denying relief without the Immigration Judge ("IJ"), (1) on all claims,

ruling expressly as to his credibility; (2) on his withholding claim, considering the likelihood of his facing life-threatening injury in El Salvador as a member of a cognizable "social group," specifically, (a) "former gang members who actively distance themselves from the gangs and work to oppose them," or (b) "individuals working in El Salvador to rehabilitate youth in order to prevent their joining gangs," Pet'r Br. at 10–11; and, (3) on his CAT claim, recognizing that, if returned to El Salvador, petitioner faces likely torture by the police or by gangs acting with the acquiescence of the police. The arguments do not persuade because, *first*, any failure by the IJ to make an explicit credibility finding requires no remand because the BIA explicitly assumed petitioner's credibility in upholding the IJ's decision, consistent with 8 U.S.C. §§ 1158(b)(1)(B)(iii) & 1231(b)(3)(C). *Second*, the IJ, *sua sponte*, effectively considered the social groups identified by petitioner in this court, and the record evidence considered in light of controlling precedent does not support, much less compel, the conclusion that these social groups bear the particularity or social distinction required for withholding of removal. *Third*, the record evidence also does not compel the conclusion that petitioner faces likely torture either directly by or indirectly with the acquiescence of Salvadoran police, as required for CAT relief.

PETITION DENIED.

————————

ROBERT GRAZIANO, Buffalo, New York, *for Petitioner*.

EVAN P. SCHULTZ (Joseph H. Hunt, Stephen J. Flynn, *on the brief*), United States Department of Justice, Office of Immigration Litigation, Washington, District of Columbia, *for Respondent*.

2

REENA RAGGI, *Circuit Judge*:

Ricardo Quintanilla-Mejia ("Quintanilla") is a citizen of El Salvador who has unlawfully entered, or attempted to enter, the United States four times in twenty years, the last three entries after removal by federal authorities. He now seeks to avoid another removal by petitioning this court for review of a 2017 decision of the Board of Immigration Appeals ("BIA" or "Board") upholding an Immigration Judge's ("IJ") order authorizing reinstatement of a prior order of removal. *See In re Ricardo Quintanilla-Mejia*, No. A077 174 686 (BIA Dec. 26, 2017), *aff'g* No. A077 174 686 (Immigr. Ct. Batavia July 27, 2017). Quintanilla maintains that he is entitled to relief from removal pursuant to 8 U.S.C. § 1231(b)(3)(A), which mandates withholding of removal "if the Attorney General decides that the alien's life or freedom would be threatened" in the country of removal "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." He further claims relief under the Convention Against Torture ("CAT") because of the likelihood that, if returned to El Salvador, he will be tortured by police officials or by members of his former gang with police acquiescence.[1] Quintanilla argues that the agency erred in denying him relief (1) on all claims, because the IJ did not expressly rule as to Quintanilla's credibility; (2) on his withholding claim, because the IJ did not

---

[1] *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, 114 ("No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."); *see also* 8 C.F.R. § 1208.16(c) (listing standards of eligibility for withholding of removal under CAT).

consider the likelihood of Quintanilla facing persecution in El Salvador as a member of a cognizable "social group," specifically, (a) "former gang members who actively distance themselves from the gangs and work to oppose them," or (b) "individuals working in El Salvador to rehabilitate youth in order to prevent their joining gangs," Pet'r Br. at 10[2]; and (3) on his CAT claim, because the IJ failed to recognize that Quintanilla faces likely torture by Salvadoran police or by gangs acting with the acquiescence of the police.

None of the arguments persuades. *First*, as to credibility, any failure by the IJ to make an explicit credibility determination does not require remand because the BIA explicitly assumed petitioner's credibility in upholding the IJ's decision, consistent with 8 U.S.C. §§ 1158(b)(1)(B)(iii) & 1231(b)(3)(C). *Second*, as to withholding, the IJ, *sua sponte*, effectively considered the social groups now identified by petitioner on appeal. Further, the record evidence considered in light of controlling precedent does not support, much less compel, the conclusion that these social groups bear the particularity or recognized social distinction required for withholding of removal. *Third*, the record evidence also does not compel the conclusion that

---

[2] "The term 'persecution,' used in authorizing claims for asylum, 8 U.S.C. § 1101(a)(42)(A), *see id.* § 1158(b)(1)(A)–(B)(i), is frequently also used to reference the 'threat' to 'life or freedom' required to secure withholding of removal, *id.* § 1231(b)(3)." *Scarlett v. Barr*, 957 F.3d 316, 321 n.1 (2d Cir. 2020) (collecting cases). Thus, we use the word "persecution" throughout this opinion in discussing Quintanilla's challenge to the denial of his withholding claim, even though Quintanilla was not eligible for asylum because he reentered the United States illegally after having been removed. *See* 8 U.S.C. § 1231(a)(5); *Herrera-Molina v. Holder*, 597 F.3d 128, 139 (2d Cir. 2010) (observing that alien previously removed from United States is ineligible for asylum but may seek withholding).

4

petitioner faces likely torture either directly by or indirectly with the acquiescence of Salvadoran police, as required for CAT relief.

Accordingly, we deny the petition for review.

**BACKGROUND**

## I.   Quintanilla's Illegal Entries into the United States

### A. First Entry (1991) and Removal (2000)

Quintanilla first left El Salvador and unlawfully entered the United States in 1991 when he was 13 years old.  That entry was effected by a smuggler hired by Quintanilla's older sister, who was already in this country.

By 1994, Quintanilla was addicted to heroin and a member of the notorious Mara Salvatrucha gang ("MS-13") in California. Quintanilla sold cocaine for the gang in return for heroin.  In 1999, he was convicted in California of unlawful heroin possession.  In February 2000, federal authorities removed Quintanilla from this country, with strict limits on his ability to return as a result of his felony drug conviction.  *See* 8 U.S.C. § 1182(a)(9) (prohibiting removed aliens from entering United States for ten years absent prior consent of Attorney General).

### B. Second Entry (2001) and Removal (2001)

Within two months of Quintanilla's removal, his sister again paid a smuggler to arrange for her brother to enter the United States. The smuggler, however, abandoned Quintanilla in Mexico, where he remained until 2001 when he attempted to enter the United States as a Mexican citizen named "Antonio Silva."  App'x at 168.  When a

5

border fingerprint check revealed Quintanilla's prior California conviction, federal officials returned him to Mexico.

### C. Third Entry (2001) and Removal (2010)

Within days of his second removal, Quintanilla hired another smuggler who helped him successfully enter the United States without inspection later in 2001. After spending a few weeks with family in California—where he was nominally still on probation for his 1998 drug conviction—Quintanilla relocated to Michigan, a move he attributes to his desire to sever all connections to gangs.

Sometime in 2006–07, Quintanilla left Michigan and moved to Minnesota where family members operated a restaurant. There, he was twice convicted, first in 2008 on a state charge of drunk driving, and again that same year on a federal charge of unlawful entry into the United States. The Department of Homeland Security ("DHS") reinstated Quintanilla's previous order of removal and, in 2010, removed him to El Salvador. *See* 8 U.S.C. § 1231(a)(5).

### D. Fourth Entry (2016)

Quintanilla was attempting to enter the United States unlawfully for a fourth time on October 3, 2016, when federal immigration officials intercepted him near Hidalgo, Texas. On October 6, 2016, DHS filed a notice of intent to reinstate his prior removal order, but because Quintanilla professed a fear for his life if

6

returned to El Salvador, he was referred for interview to an asylum officer.[3]

## II. Agency Proceedings Seeking Relief from Removal

### A. The "Reasonable Fear" Interviews

Quintanilla participated *pro se* in two lengthy telephone interviews by an asylum officer on November 28, 2016, and on December 12, 2016.[4] The record of the interviews indicates that Quintanilla—through an interpreter—stated that he feared returning to El Salvador because MS-13 members in that country viewed him as a "traitor" for leaving the gang, attempting to remove his gang tattoos, and participating in a church program that encouraged Salvadoran youths not to join or to leave gangs. App'x at 397.[5]

---

[3] *See* 8 C.F.R. § 208.31(b)–(c) (stating that if alien subject to reinstatement of removal order expresses fear of returning to his country, he shall be referred to asylum officer for interview to determine if alien has "reasonable fear of persecution or torture"); *see also id.* § 241.8(e) (excepting aliens expressing reasonable fear of removal from general requirement that aliens with reinstated removal orders are not entitled to hearing before IJ prior to removal).

[4] Prior to these interviews, Quintanilla appears to have consulted with Robert Graziano, the same attorney who later represented him before the BIA and who currently represents him before this court.

[5] Quintanilla was removing his tattoos with the assistance of Programa Integral de Remoción de Tatuajes del Instituto Nacional de la Juventud ("Programa Integral"), which he described as a government-sponsored program financed by a European non-profit organization. He identified the church group in which he participated as Iglesias Evangelicas Unidas Para La Paz ("Iglesias Evangelicas"), where one of his brothers served as president and pastor.

Quintanilla stated that after gang members learned, sometime in 2010–11, of his efforts to remove his tattoos, they repeatedly threatened his life. To avoid being killed, he left the removal program and acquiesced in gang demands that he make extortionate "rent" payments and store guns for the gang. *Id.* Quintanilla never complained to the police about these gang actions, explaining that he believed the Salvadoran police to be corrupt and, in some cases, complicit with gangs.

Quintanilla claimed that, some years later, in or about October 2015, gang members falsely accused him of stealing an AK-47 firearm and attempted to beat him to death. Quintanilla survived the beating, but was hospitalized with serious injuries. When questioned by police, Quintanilla falsely reported being the victim of a robbery because he thought police would inform gang members if he filed a truthful complaint against them. He stated that "neighbors" who had reported gang extortion demands to the police "were killed because the police informed the gangs." *Id.* at 401.

A few days after Quintanilla's hospital discharge, gang leader Sergio Hernandez sought out Quintanilla at his home and attempted to shoot him. When, instead, Hernandez's gun jammed, Quintanilla picked up a knife and stabbed the gang leader in the neck, but did not kill him. The next day, Quintanilla fled to Mexico explaining, "I stabbed a powerful person in El Salvador. This person has power all over El Salvador to tell people what to do to me because of what I did to him." *Id.* at 402. During the second of his reasonable fear interviews, Quintanilla identified the stabbing incident as the "main reason" he feared for his life if returned to El Salvador. *Id.* at 411.

8

After fleeing El Salvador, Quintanilla stayed in Mexico for approximately a year, during which time he learned from a brother in El Salvador that Hernandez had issued an "international order" for Quintanilla's death. *Id.* at 398. Asked why he did not seek asylum in Mexico, Quintanilla explained that he had entered that country illegally and, except for a cousin, had no family there.

Quintanilla gave conflicting accounts of his interactions with Salvadoran police. For instance, in his first reasonable fear interview, Quintanilla stated that police beat him "6 or 7 times leaving church." *Id.* at 403. Nevertheless, he said,

> I'm not really afraid of the police because I don't have a record there [presumably, El Salvador] so I don't owe them anything. I know that they beat me up before, but I'm not really afraid of that in the future. It's just a precaution because there is a war going on between the gangs and the police.

*Id.*

In his second interview, Quintanilla said police beat him "two or three times." *Id.* at 409. Reminded by the asylum officer of his earlier statement that police had beat him six or seven times, Quintanilla reiterated that "[t]hey beat me like three times but they were always threatening me." *Id.* Asked to clarify whether "[t]he police were always threatening you," Quintanilla reversed course: "The police did not but they were always following me around because I was tattooed." *Id.* Asked if the police had, in fact, beat him up outside church, Quintanilla stated:

9

I never said the police beat me. I said the gang beat me. They [presumably, the police] were following me around because I had the tattoos but they were never able to get anything against me. If there was ever an occasion that they wanted to beat me. But they never did anything violent except hit me but the neighbors defended me.

*Id.* Asked whether "the police beat you or not," Quintanilla stated, "They hit me a few times but not outside of church. It was after I was making a purchase at the store and I was heading home. . . . Because I have the tattoos that associate me with being a gang member." *Id.*

In the same interview, Quintanilla insisted that he "didn't say" in his first reasonable fear interview that police had beat him six or seven times after leaving church, and that it was "very strange" for that to be reflected in the asylum officer's notes because "that didn't happen. I said they attempted to beat me many times but my neighbors supported me and they stopped them." *Id*.

Notwithstanding Quintanilla's contradictory testimony regarding his interactions with the police in El Salvador, the asylum officer found Quintanilla to have stated a credible claim for CAT relief but not for statutory withholding of removal.[6] On December 20, 2016,

---

[6] The difference might be explained by the fact that CAT relief does not require proof of a nexus element, whereas withholding relief does. *See Hong Fei Gao v. Sessions*, 891 F.3d 67, 76 (2d Cir. 2018) ("Unlike asylum and withholding of removal, CAT relief does not require a nexus to a protected ground." (internal quotation marks omitted)).

10

the asylum officer referred Quintanilla to an IJ for an evidentiary hearing on whether to grant relief from removal.

## B. The IJ Hearing

### 1. I-589 Form

Before the IJ hearing, on March 16, 2017, Quintanilla submitted an I-589 Application for Asylum and for Withholding of Removal. In response to a form inquiry asking whether relief was sought based on race, religion, nationality, political opinion, membership in a particular social group, or the CAT, Quintanilla checked only the boxes for religion and the CAT. On the form, Quintanilla stated that he had suffered past "physical assaults and verbal abuse," and also had "been threatened with death by members of gangs for deciding to no longer be a gang member, and by government authorities for being an ex-gang member." *Id.* at 278. He stated that he feared future torture for "four reasons": (1) "I have renounced the life as a gang member without aut[h]orization ([which] is not way to get out)"; (2) "I participated in an integral government program where my gang-related t[attoos] were removed"; (3) "I participated in a religious organization that taught against violence and promoted peace; this organization angered both the government and the several gang[s] of [E]l Salvador"; and (4) "I have injured a leader of a gang who attempted to kill me before I left the country and returned to the U.S." *Id.* at 279, 285.

11

## 2. Hearing Testimony

Appearing *pro se* before the IJ on June 1, 2017,[7] Quintanilla provided testimony that was generally, but not entirely, consistent with the statements he had made at his reasonable fear interviews. As pertinent here, Quintanilla testified that it was soon after his 2010 removal to El Salvador that he began participating in Programa Integral's tattoo-removal program. He submitted a letter from a program official attesting to his participation from December 2009 through April 2010. Quintanilla stated that, as part of this program, he gave a video-recorded interview to representatives of the European sponsoring non-profit organization. He testified that, although he was promised confidentiality, the Salvadoran government posted his interview online, which resulted in MS-13 learning of his efforts at rehabilitation and threatening his life.[8] Quintanilla recounted that in 2013, the gang "gave an order that all the former gang members that have been involved in Christian things or rehabilitation programs . . . had to be killed." *Id.* at 176. Quintanilla stated that, by then, he was working with the Christian church group,

[7] It appears that Quintanilla was no longer consulting with counsel at this time because he and his family could not afford attorney's fees. The IJ had granted Quintanilla two continuances to secure counsel and provided him with a list of *pro bono* counsel.

[8] At his reasonable fear interviews, Quintanilla stated that the European non-profit organization supporting Programa Integral posted his interview online because "they needed proof they were helping out." App'x at 410 ("I don't know exactly the website but it was going through YouTube."). Quintanilla told the IJ he did not have any printouts or still photos from the internet showing his tattoo-removal interview but that he could obtain them by calling Programa Integral. *See id.* at 192 (stating that program was "confidential" but that he could obtain by calling because "they will listen to my voice and know that it's me").

12

Iglesias Evangelicas, "to rescue [youths] from the gangs so they can be contributing members in the society in El Salvador." *Id.* at 178.[9]

Quintanilla stated that, nevertheless, for some years MS-13 subjected him only to verbal abuse because he paid extortion to and stored guns for them.[10] Things changed in October 2015 when gang members accused Quintanilla of stealing an AK-47 firearm. Quintanilla testified that the accusation was false and only an "excuse" to beat him to death. *Id.* at 192.[11] Quintanilla sustained severe injuries from the beating and was hospitalized. Soon after Quintanilla's discharge, the gang leader—angry that Quintanilla had survived—went to his home and tried to shoot him. When the

---

[9] Quintanilla submitted an undated letter from Luz de Maria de Zetino, identified as the pastor in charge of Iglesias Evangelicas's human rights department, which described Quintanilla as a former employee who had commendably worked in the church's violence prevention, rehabilitation, and reintegration program for at-risk youth.

[10] Quintanilla told the IJ that, until 2013, the gang threatened him and "torture[d him] verbally, psychologically, morally." App'x at 176. Although he claimed "physical torture" too, when asked to explain, he said gang members had called him "a traitor" and other "bad words." *Id.* Later in his testimony, Quintanilla would state that "[t]he gang was always hitting me and torturing me verbally for almost five years." *Id.* at 192.

[11] Asked why a gang as vicious as MS-13 would need an excuse to kill him, Quintanilla stated,

> They knew that I was a religious person and that I was working with youth. But they had to have a good argument to violate the laws of religion and to be able to kill me. And that's why they accused me that I had stolen an AK-47. With that accusation, . . . they can take me out and kill me.

*Id.*

leader's firearm jammed, Quintanilla "grab[bed] a knife" and stabbed the leader in the neck, inflicting a non-fatal injury. *Id.* at 177. The next day, Quintanilla fled to Mexico.

Quintanilla testified that, if removed to El Salvador, he feared that his life would be in danger not only from MS-13 but also from police. Confronted with his reasonable fear interview statement that he did not fear the police, Quintanilla explained that he had had no fear of police "at that moment," but professed to have a fear "in the future." *Id.* at 193–94.

Quintanilla explained that, on three occasions approximately a year and a half after his 2010 removal to El Salvador, police had tried to hurt him and to bring him "to a place so I can be killed," although they did not in fact do so. *Id.* at 182. On the first occasion, police officers professing their own support for rival gang MS-18 tried to remove Quintanilla from his home, assuming from his tattoos that he was still affiliated with MS-13. They abandoned that attempt after Quintanilla's neighbors intervened.[12] Soon after, police tried to beat Quintanilla as he was leaving church, stating that they did not believe that he was now a Christian and no longer a gang member. Finally, "probably in 2012," police took Quintanilla to "the crime department of El Salvador" where they hurt, but did not kill, him, a restraint that Quintanilla attributed to the fact that his neighbors had taken down "the plate number and the serial number" of the police vehicle in

---

[12] Quintanilla offered no corroborating evidence from any neighbor, attributing the omission to neighbors' fear.

14

which he was taken away and, thus, "were a witness if anything happened to me." *Id.* at 184.

Quintanilla acknowledged that he had no further problems with the police in the years between 2012 and his 2015 departure from El Salvador, but he claimed to have heard from his brother that police were currently arresting former gang members who arrived at the airport and turning them over to the gangs "[s]o that the gangs can kill them." *Id.*[13]

### 3. The IJ Decision Denying Relief

In a detailed decision dated July 27, 2017, the IJ denied Quintanilla relief from removal. In so ruling, the IJ observed that he had considered not only Quintanilla's testimony, but also his reasonable fear interview statements, his I-589 filing, and all documents received in evidence, including the State Department's 2015 and 2016 Human Rights Country Reports for El Salvador and its 2015 International Religious Freedom Report.

### a. Withholding of Removal

As to withholding, the IJ found that Quintanilla failed to carry his evidentiary burden as to the required nexus between his professed

---

[13] On this point, Quintanilla offered no corroborating statement from his brother, nor did he offer other corroborating evidence from any other family member remaining in El Salvador—three brothers, three sisters, and his parents—all of whom he claimed had also been threatened by gang members and, as a result, forced to move from their village to another area. The reported police misconduct respecting returning gang members also lacked support in either the State Department's 2015 or 2016 Human Rights Country Reports for El Salvador, both of which were received in evidence by the IJ.

15

fear of future harm and a protected ground.[14]  On his I-589 form, Quintanilla had indicated that he feared future persecution based on religion.  Nevertheless, the IJ *sua sponte* considered whether such a fear might also be based on Quintanilla's membership in a cognizable social group.  In concluding that it did not, the IJ found that Quintanilla's testimony indicated that gang members targeted him to "enforce their code of conduct and punish [his] infidelity" to the gang. *Id.* at 57.  But this was insufficient to satisfy withholding's nexus element in light of agency precedent instructing that persons who renounce, reject, or resist gang membership do not constitute a cognizable "social group."  *Id.* at 56–57 (citing *Matter of W-G-R-*, 26 I. & N. Dec. 208 (B.I.A. 2014); *Matter of E-A-G-*, 24 I. & N. Dec. 591 (B.I.A. 2008)).

As to a religion nexus, the IJ found no record evidence "that the gang had singled [Quintanilla] out on account of his religious practices." *Id.* at 57.  Rather, what the gang appeared to object to was "respondent's activities of trying to rehabilitate youth" so that they would leave or not join gangs.  *Id.*  While Quintanilla participated in such activities through a religious organization, the IJ again pointed to controlling agency precedent instructing that persons engaged in

---

[14] Having found Quintanilla not to have carried his nexus burden for withholding, the IJ did not address whether he satisfactorily established that the feared conduct qualified as "persecution" because it was attributable to public officials, whether directly or indirectly because of their inability or unwillingness to control gangs. *See Scarlett v. Barr*, 957 F.3d at 328 ("To qualify as 'persecution' the conduct at issue must be attributable to the government, whether directly because engaged in by government officials, or indirectly because engaged in by private persons whom the government is unable or unwilling to control." (internal quotation marks omitted)).

resistance to gangs, whether for "personal, moral, or religious" reasons, did not constitute a cognizable social group. *Id.* (citing *Matter of S-E-G*, 24 I. & N. Dec. 579 (B.I.A. 2008)).

### b. CAT Relief

As for the CAT, which requires proof of likely torture by or with the acquiescence of government officials without regard to nexus, the IJ concluded that Quintanilla was not entitled to relief because he had indicated "with specificity that he had not been harmed or beaten by the police" while in El Salvador. *Id.* at 57–58. Further, despite Quintanilla's claim of police corruption, he had adduced no evidence that the MS-13 members who had harmed Quintanilla were acting in any official capacity or with official acquiescence. Finally, citing documentary evidence that the government of El Salvador was trying to control gang activity, the IJ found an insufficient evidentiary basis to conclude that police would turn "a willful blind eye" to gang attacks on Quintanilla if he were returned to El Salvador. *Id.* at 58.

Accordingly, the IJ ordered Quintanilla returned to custody for the government to reinstate its prior order of removal.

### 4. BIA Upholds Denial of Relief

Quintanilla filed a timely *pro se* notice of appeal with the BIA. By the time his brief was due, Quintanilla had secured counsel who argued on his behalf that the IJ had erred by failing (1) to make an express determination as to Quintanilla's credibility, (2) to consider whether Quintanilla's activities "trying to rehabilitate youth"

identified a cognizable social group, *id.* at 15[15]; (3) to consider whether the Salvadoran government's disclosure on social media of Quintanilla's participation in a gang-tattoo-removal program amounted to acquiescence in gang torture; and (4) to consider State Department findings of corruption in and ineffectiveness by Salvadoran law enforcement.

In its December 26, 2017 decision rejecting these arguments, the BIA expressly assumed Quintanilla's credibility in upholding the IJ's determination that Quintanilla failed to carry his evidentiary burden for relief from removal. As to withholding, the BIA summarized Quintanilla's own testimony—that gang members initially threatened him when they discovered he was trying to remove his gang tattoos; that Quintanilla then complied with gang demands that he pay extortion and store gang guns; and that a stolen-gun accusation in 2015 prompted two failed gang attempts to kill him, during the second of which Quintanilla stabbed his assailant and then fled the country—and concluded that it did not support a claim of persecution based on religion.

In reaching the same conclusion with respect to a social-group nexus, the BIA considered Quintanilla's membership in three possible groups: (1) former gang members, (2) former gang members from the United States who resist and actively act against the gangs, and (3)

---

[15] Before the BIA, counsel argued that Quintanilla had demonstrated a fear of persecution based on membership in three social groups consisting of (1) "former gang members from the United States who resist and actively act against the gangs," (2) "individuals working in El Salvador to rehabilitate youth in order to prevent their joining gangs," and (3) "individuals who have publicly repudiated their former gang membership." App'x at 12, 15–16.

18

former tattooed gang members. The BIA concluded that the hearing record failed to show that any of these groups exhibited the immutable characteristics, particularity, and social distinction required by agency precedent to be recognized as a protected social group under the withholding statute. *See id.* (collecting cases).

As for CAT relief, the BIA noted both Quintanilla's admitted failure to report gang abuse to the police and his "confusing testimony" about past mistreatment by the police in identifying "no clear error" in the IJ's determination that Quintanilla failed to demonstrate likely future torture by or with the consent or acquiescence of Salvadoran authorities. *Id.* (citing *Matter of Z-Z-O-*, 26 I. & N. Dec. 586 (B.I.A. 2015), to support conclusion that IJ's predictive finding as to future event is largely factual and subject to clear-error review).

Accordingly, the BIA dismissed Quintanilla's appeal.

### III.    Petition for Judicial Review

With the assistance of counsel, Quintanilla timely petitioned this court for review, challenging the agency's denial of both withholding and CAT relief, and moving for *in forma pauperis* status and a stay of removal pending resolution of his petition. This court granted Quintanilla's motions, and we now address his petition.

## DISCUSSION

### I.    Standard of Review

In the circumstances of this case, where Quintanilla was previously ordered removed for a drug offense, this court lacks

19

jurisdiction to review any final order of removal except for constitutional or legal challenges. *See* 8 U.S.C. § 1252(a)(2)(C) (stripping courts of "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in" 8 U.S.C. § 1182(a)(2))[16]; *id.* § 1252(a)(2)(D) (permitting "review of constitutional claims or questions of law"). In short, we cannot review purely factual challenges to Quintanilla's order of removal. *See id.* § 1252(a)(2)(C); *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020). As the Supreme Court recently clarified, however, that limitation does not apply to CAT orders, which are not themselves final orders of removal and do not affect the final validity of such orders. *See Nasrallah*, 140 S. Ct. at 1691. Thus, we can review factual challenges to the order denying Quintanilla CAT relief, but subject to the "highly deferential" substantial evidence standard. *Id.* at 1692. Under that standard, we must uphold agency factfinding "unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. 1252(b)(4)(B) (emphasis added); *see Shunfu Li v. Mukasey*, 529 F.3d 141, 146 (2d Cir. 2008) (quoting statute).

In *Nasrallah*, the Supreme Court expressly "le[ft] for another day" the question of whether its reasoning as to CAT orders applies equally to statutory withholding-of-removal orders. 140 S. Ct. at 1694. While our court has yet to decide the question, we need not do so here because, even if we assume *arguendo* that our authority to review Quintanilla's withholding challenge is the same as our authority to

---

[16] Section 1182(a)(2) states, in pertinent part, that an "alien convicted of . . . a violation of . . . any law . . . of a State . . . relating to a controlled substance" is inadmissible. 8 U.S.C. § 1182(a)(2)(A)(i)(II). Quintanilla's 1999 removal order was pursuant to § 1182(a)(2), as a result of his California heroin conviction.

review his CAT challenge, we would not grant his petition.  *See Ivanishvili v. U.S. Dep't of Just.*, 433 F.3d 332, 338 n.2 (2d Cir. 2006) (declining to address statutory question of jurisdiction where substance of claim is plainly without merit).

In sum, in explaining why we now dismiss Quintanilla's petition, we apply the substantial evidence standard to questions of fact raised in his withholding and CAT challenges, and *de novo* review to all questions of law, including the application of law to facts.  *See Pierre v. Gonzales*, 502 F.3d 109, 113 (2d Cir. 2007).  Finally, because the BIA expressly adopted the IJ's reasoning, we review the IJ's decision as modified by the BIA's decision.  *See Yan Chen v. Gonzales*, 417 F.3d 268, 271–72 (2d Cir. 2005).

## II.    Credibility Determination

Quintanilla submits that the IJ erred in denying him relief from removal without expressly ruling on his credibility.  The government concedes that the IJ did not make an explicit credibility finding, but argues that this error does not require remand because the BIA presumed Quintanilla's credibility on appeal yet still denied relief.  *See* Resp't Br. at 21–22; 8 U.S.C. § 1158(b)(1)(B)(iii); *see also id.* § 1231(b)(3)(C).  We agree. [17]

---

[17] In his reply brief to this court, Quintanilla professes a willingness to abandon his lack-of-an-explicit-credibility finding challenge provided that this court reviews the agency's denial of relief "with an eye that [Quintanilla]'s testimony was credible."  Pet'r Reply Br. at 4; *see* Oral Arg. at 0:34 (confirming

## A. The Law Pertaining to Credibility Findings

The IJ's obligation to assess credibility derives from statute. In determining an alien's claim for relief from removal, 8 U.S.C. § 1231(b)(3)(C) states that "the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B) of this title." The referenced subsections state that (1) the testimony of an alien seeking relief from removal "may be sufficient to sustain [his] burden without corroboration" provided it is "credible, is persuasive, and refers to specific facts sufficient to demonstrate" eligibility for relief, *id.* § 1158(b)(1)(B)(ii), and (2) a trier of fact must assess credibility "[c]onsidering the totality of the circumstances," *id.* § 1158(b)(1)(B)(iii). *See also* 8 C.F.R. § 1208.16(b) (stating that applicant's testimony, "if credible, may be sufficient to sustain the burden of proof without corroboration"); *id.* § 1208.16(c)(2) (same regarding CAT claims).

We have construed these statutory provisions to "require[] a twofold determination. First, the agency must determine whether the applicant's testimony is credible . . . . Second, the agency must determine whether the applicant has met his or her burden of proof." *Diallo v. I.N.S.*, 232 F.3d 279, 290 (2d Cir. 2000). Such a sequential approach serves to ensure both "that an alien receives the potential benefit of succeeding on credible testimony alone," and "that

same). While we are not ourselves obliged to make that assumption, *see Garland v. Ming Dai*, 141 S. Ct. 1669, 1678 (2021) (holding that statutory presumption of credibility applies only to administrative appeal and not to judicial review), to the extent the BIA did so, we follow suit in explaining herein why we nevertheless identify no error in the agency's denial of relief from removal. *See infra* Part III.C.

appellate review of such a determination is preserved." *Zaman v. Mukasey*, 514 F.3d 233, 237 (2d Cir. 2008) (internal quotation marks omitted).

To "encourage[] the IJ to make specific findings about credibility," the law "provides that absent an 'explicit' 'adverse credibility determination,' 'the applicant or witness shall have a rebuttable presumption of credibility on appeal.'" *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677–78 (2021) (internal alterations omitted) (quoting 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C), 1229a(c)(4)(C)). In *Ming Dai*, the Supreme Court "le[ft] for another day" the question of exactly what an IJ "must say or do to furnish" an explicit adverse credibility determination, holding only that, on appeal, the BIA need not "follow a particular formula or incant magic words like 'incredible' or 'rebutted'" in rejecting the presumption. *Id.* at 1679. This court, however, has held that "the IJ need not engage in robotic incantations to make clear that he has considered and rejected a petitioner's proffered explanation." *Xiao Ji Chen v. U.S. Dep't of Just.*, 434 F.3d 144, 160 n.13 (2d Cir. 2006) (internal quotation marks omitted); *see Contreras-Salinas v. Holder*, 585 F.3d 710, 715 (2d Cir. 2009) (denying petition where "apparent from the IJ's decision that he found [petitioner's] evidence to be not credible and outweighed by" other evidence); *cf. Diallo v. I.N.S.*, 232 F.3d at 287 (identifying error where IJ who failed to make credibility determination denied relief based solely on lack of corroboration because law permits applicants to rely exclusively on their credible testimony).

## B. The Agency's Treatment of Credibility

Applying these principles here, we conclude that Quintanilla cannot complain of the IJ's failure to make an explicit adverse credibility ruling with respect to withholding of removal because the record convincingly shows that the IJ assumed the credibility of Quintanilla's statements as to his 2010–16 experiences in El Salvador with gangs, rehabilitative organizations, and a church group. Indeed, the IJ reported Quintanilla's version of events respectfully and in some detail in stating that he had "carefully considered the testimony of the respondent and the documentary evidence of record," but "conclude[d] the respondent failed to carry his burden to demonstrate eligibility" for relief from removal. *Id.* at 49. Such a statement is reasonably construed "to mean that[,] even assuming the applicant to be credible, which the IJ did, the applicant nevertheless failed to meet his burden of proof." *Gashi v. Holder*, 702 F.3d 130, 135 n.3 (2d Cir. 2012) (adopting stated conclusion as reached by BIA); *see Garland v. Ming Dai*, 141 S. Ct. at 1680 (explaining that evidence may be credible without being sufficient).

The same conclusion obtains with respect to that part of Quintanilla's CAT claim based on gang violence acquiesced in by corrupt police. The record convincingly indicates that the IJ made no adverse credibility ruling but, rather, implicitly assumed the credibility of Quintanilla's accounts, *see* App'x at 58 (acknowledging "high level of [gang] violence" and reports of "police or military malfeasance" in El Salvador), in nevertheless finding such evidence insufficient to carry Quintanilla's burden.

24

To the extent that Quintanilla also sought CAT relief based on direct police violence, the record does not clearly indicate whether the IJ credited or discredited Quintanilla's numerous inconsistent statements about past police mistreatment. Rather, the IJ noted the inconsistencies in finding that Quintanilla failed to carry his burden of proof. The omission requires no remand, however, because the BIA explicitly afforded all Quintanilla's statements the statutory presumption of credibility and, nevertheless, reached the same insufficiency conclusion. *See Garland v. Ming Dai*, 141 S. Ct. at 1680.

Accordingly, we identify no error in the IJ's failure to make an explicit finding as to Quintanilla's credibility because we conclude from the record that the IJ assumed the credibility of much of Quintanilla's testimony, and, in any event, the BIA explicitly afforded the whole of his testimony the presumption of credibility provided by 8 U.S.C. §§ 1158(b)(1)(B)(iii) & 1231(b)(3)(C) in upholding the denial of relief from removal.

## III.  Withholding Relief Based on "Social Group"

Quintanilla also faults the IJ for failing adequately to consider his eligibility for withholding of removal "because of . . . membership in a particular social group." 8 U.S.C. § 1231(b)(3)(A).[18]  Before this

---

[18] In his principal brief before this court, Quintanilla raises no challenge to the agency's denial of withholding based on feared religious persecution. Indeed, he concedes that omission in his reply brief. *See* Pet'r Reply Br. at 5 (stating that "initial argument was that []his religious work fit more appropriately into a

court, he challenges the agency's findings only as to his membership in "the potential social group of former gang members who actively distance themselves from the gangs and work to oppose them," Pet'r Br. at 10; *see* Pet'r Reply Br. at 7, and the group of "individuals working in El Salvador to rehabilitate youth in order to prevent their joining gangs," Pet'r Br. at 11. The argument fails because the record shows that the IJ, (1) did consider – *sua sponte* – the social groups now identified by Quintanilla and (2) did not err in concluding that they did not warrant withholding of removal under § 1231(b)(3)(A).

### A. Waiver

Before explaining that conclusion, we address the government's argument that Quintanilla waived a withholding argument based on *any* social group because, in agency proceedings—at least through the IJ hearing—Quintanilla specifically identified only "religion" as the protected ground for which he sought relief. Resp't Br. at 23. We are not persuaded. While Quintanilla did not expressly employ the phrase "social group" in pursuing withholding before the IJ, the IJ himself, mindful of

particular social group analysis than religious persecution"). Insofar as Quintanilla attempts for the first time in his reply brief to appeal the agency's rejection of his religious persecution claim, the argument is waived. *See Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021) ("[I]ssues raised for the first time in a reply brief are generally deemed waived." (internal quotation marks omitted)). In any event, Quintanilla's reply brief fails to show how the record evidence, even assuming its credibility, compelled the conclusion that Quintanilla "was targeted on account of his religion, any religious preaching, or any [religious] efforts to get gang members to quit the gang or otherwise rehabilitate them." App'x at 4 (upholding IJ finding that evidence did not so reflect); *see Cao He Lin v. U.S. Dep't of Just.*, 428 F.3d 391, 400 (2d Cir. 2005) (observing only "evidence that would compel a contrary conclusion indicates a lack of substantial evidence").

Quintanilla's then-*pro se* status, liberally construed the evidentiary record to assert a fear of future persecution based on both religion and social group. *See Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 31 n.16 (B.I.A. 2020) (finding social group claims not waived where IJ construed such groups for *pro se* respondent but, nevertheless, declining to reach issue). Moreover, when Quintanilla's counsel specifically argued persecution based on social groups on appeal, the BIA identified no exhaustion concerns but, rather, addressed the argument on the merits. In these circumstances, we identify no waiver, and proceed to consider the petition. *See generally Adams v. Holder*, 692 F.3d 91, 96 n.2 (2d Cir. 2012) (rejecting exhaustion challenge where BIA construed alien's *pro se* brief implicitly to raise argument).

### B. The IJ Did Consider the Social Groups Now Raised by Quintanilla

The record shows that the IJ did consider, *sua sponte*, the very social groups that Quintanilla now raises on appeal: (1) former gang members who actively distance themselves from the gang and work to oppose them, and (2) individuals in El Salvador who work to rehabilitate youth to prevent their joining gangs.[19] This consideration

---

[19] In light of this conclusion, we need not consider the extent to which *Paloka v. Holder*, 762 F.3d 191, 198–99 (2d Cir. 2014), relied on by Quintanilla, permits a petitioner to "refine," or even to redefine, the social group that was the basis for his withholding claim before the IJ or the BIA. We note only that in *Paloka* we ordered remand so that the agency could, in the first instance, reconsider petitioner's claim for relief from removal in light of more recent, controlling agency precedent clarifying the criteria for recognizing a particular social group.

is evident from the IJ's summary of the evidence on which Quintanilla now relies to demonstrate his membership in these groups. Specifically, the IJ detailed Quintanilla's account of his own renunciation of gang membership, his publicized participation in a gang rehabilitation program, and his work with a church group attempting to rehabilitate young men recruited by gangs. Further, in concluding that these facts did not support withholding of removal, the IJ relied on controlling agency precedent declining to identify as "particular social groups" persons who had renounced or resisted gang membership, specifically, (1) *Matter of W-G-R-*, 26 I. & N. Dec. at 221, which held that former members of a Salvadoran gang—there, Mara 18—who renounced their gang membership did not constitute a particular social group for purposes of withholding of removal; and (2) *Matter of S-E-G-*, 24 I. & N. Dec. at 581, which declined to recognize as a particular social group persons who "rejected or resisted membership in . . . gang[s] based on their own personal, moral, and

---

*See id.* at 199. It was in that context that we identified as a further reason for remand the fact that petitioner had "refined her particular social group during her appeal" to include "a specific age range . . . find[ing] support in the evidence," that resulted in "a subclass that is 'specific' and subsidiary' to the broader class first proposed." *Id.* (quoting *Steevenez v. Gonzales*, 476 F.3d 114, 117 (2d Cir. 2007)). The same context informed the BIA's decision to remand to the IJ in *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 252 (B.I.A. 2014) (ordering remand where, *inter alia*, "[1] respondent's proposed social group has evolved during the pendency of this appeal, [2] our guidance on particular social group claims has been clarified since this case was last before the [IJ]," and [3] DHS did not oppose), a decision which we relied on in *Paloka*, 761 F.3d at 198–99. While this case is distinguishable at least to the extent the IJ had the benefit of the clarifying law referenced in *Paloka* and *Matter of M-E-V-G-*, we need not pursue the question of social-group refinement further because we conclude that, here, the IJ adequately considered the social groups now urged by Quintanilla in this court.

28

religious opposition to the gang's values and activities," as well as their family members. To be sure, the IJ employed this language from *Matter of S-E-G-* to explain why the religious sponsorship of Quintanilla's efforts to prevent young men from joining gangs did not support his professed fear of persecution based on religion, and the BIA affirmed for the same reason. But, as Quintanilla himself acknowledges, even before this court, he has relied on his youth work sometimes to support feared persecution based on religion, and sometimes to support feared persecution based on social group. Thus, the IJ's citation to *Matter of S-E-G-* is significant because the point made in the above-quoted language is that resistance to gangs in El Salvador no more supports a withholding claim based on religion than it does a claim based on membership in a social group.

In sum, when we consider the IJ's recitation of the facts together with the cases he relied on in denying Quintanilla withholding of removal based on membership in a social group, we are satisfied that the IJ considered the groups now identified by Quintanilla.

## C. The IJ Did Not Err in Denying Withholding Based on Social Group

While Quintanilla complains principally of the IJ's failure to consider the social groups he now identifies, he also conclusorily asserts that these groups possess the particularity and social distinction requirements for a protected social group. We identify no error in the agency's contrary conclusion.

To secure withholding of removal based on a professed fear of future persecution because of "membership in a particular social group," Quintanilla had to demonstrate that (1) his proposed social

29

group was cognizable under 8 U.S.C. § 1231(b)(3)(A), *see generally Paloka v. Holder*, 762 F.3d. 191, 195–98 (2d Cir. 2014) (discussing criteria for identifying "particular social group"); and (2) his persecutors' motive in threatening his life or freedom was, at least in part, Quintanilla's membership in that social group, *see Martinez De Artiga v. Barr*, 961 F.3d 586, 593 (2d Cir. 2020) (discussing "nexus" requirement); *Uwais v. U.S. Att'y Gen.*, 478 F.3d 513, 517 (2d Cir. 2007) (observing that in case of mixed motives, applicant need show that harm was motivated only "in part[] by an actual or imputed protected ground"). Federal immigration law does not define "membership in a particular social group," and this court has acknowledged that the phrase is sufficiently ambiguous to warrant judicial deference to BIA interpretation. *See Paloka v. Holder*, 762 F.3d at 195 (according phrase *Chevron* deference, *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).[20]

In a series of precedential opinions, the BIA has identified three criteria, each of which must be satisfied for recognition of a "particular social group." *Id.* at 196 (collecting cases). First, members of a proposed group must "share a common, immutable

---

[20] The phrase appears to derive from the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, which itself "largely incorporated the definition of a refugee contained in . . . the United Nations Convention Relating to the Status of Refugees," July 28, 1951, 189 U.N.T.S. 150 ("UN Convention"). *Matter of Acosta*, 19 I. & N. Dec. 211, 219 & n.5 (B.I.A. 1985). As the BIA has recognized, neither the UN Convention's diplomatic history nor its drafting history sheds light on the "social group" phrase's intended meaning, as the drafting committee did not include it in its proposed definition of "refugee." *Id.* at 232. Rather, the language appears to have been "added as an afterthought," with no subsequent clarification on adoption. *Id.*

characteristic," *i.e.*, a characteristic that "members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (B.I.A. 1985).[21] In addition, a second criteria requires that the identified group be "defined with particularity," while a third demands that the group be "socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (B.I.A. 2014); *see Paloka v. Holder*, 762 F.3d at 196.[22] A social group is sufficiently particular if it "ha[s] definable boundaries," *i.e.*, "characteristics that provide a clear benchmark for determining who falls within the group." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239. It is socially distinct if "the people of a given society would perceive a proposed group as sufficiently separate or distinct." *Id.* at 241. While "a persecutor's perception can be indicative of whether society views a group as distinct, a persecutor's perception alone is not enough," by itself, "to establish a cognizable social group." *Paloka v. Holder*, 762 F.3d at 196; *see Matter of M-E-V-G-*, 26 I. & N. Dec. at 242 (stating that defining particular social group "from

---

[21] Examples of immutable characteristics cited in *Matter of Acosta* include "sex, color, or kinship ties, or in some circumstances . . . a shared past experience such as former military leadership or land ownership." *Id.* at 221; *see Matter of M-E-V-G-*, 26 I. & N. Dec. at 243, 246 (identifying former employees of Colombia's Attorney General's office and former policemen as sharing immutable characteristic beyond their capacities to change); *but see Matter of Acosta*, 19 I. & N. Dec. at 234 (holding group of Salvadoran taxi drivers who refused to participate in "guerrilla-sponsored work stoppages" did not share immutable characteristic because "members of the group could avoid the threats of the guerrillas either by changing jobs or cooperating in the work stoppages").

[22] Both the BIA in *Matter of M-E-V-G-* and this court in *Paloka* discuss a series of controlling BIA precedents establishing these criteria.

the perspective of the persecutor is in conflict with our prior holding that a social group cannot be defined exclusively by the fact that its members have been subjected to harm" (internal quotation marks omitted)). Indeed, defining a social group based only on the perception of the persecutor blurs the distinction between the two steps of inquiry, the first asking whether a proposed social group is cognizable, and the second asking whether there is a nexus between that social group and threatened persecution. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 242. Society's perception ultimately determines the former, while the persecutor's motivation determines the latter. *See Paloka*, 762 F.3d at 198.

The BIA has frequently applied these principles to cases involving Central American gangs. In *Matter of W-G-R-*, relied on by the IJ here, the BIA concluded that former Mara 18 gang members in El Salvador who renounced their gang membership did not qualify as a "particular social group" because such a group is "too broad and subjective" to satisfy the particularity criterion. 26 I. & N. Dec. at 221. The Board explained that "when a former association"—such as former membership in a gang—"is the immutable characteristic that defines a proposed group, the group will often need to be further defined with respect to the duration or strength . . . and the recency of [members'] active participation if it is to qualify as a particular social group." *Id.* at 221–22. Further, in *Matter of W-G-R-*, the BIA observed that record evidence also failed to show that the proposed social group satisfied the social-distinction requirement. *See id.* at 222 (noting "scant evidence that Salvadoran society considers former gang members who had renounced their gang membership as a distinct social group"). While acknowledging "a societal stigma

32

against former gang members because of their tattoos," the BIA identified ambiguity as to whether the stigma arose because persons were known to be "former gang members or because their tattoos create[d] doubts or confusion about whether they are, in fact, former, rather than active, gang members." *Id.*

The reasoning in *Matter of W-G-R-* applies equally to Quintanilla's case to the extent he claims membership in a social group of former gang members who renounce their gang membership. Insofar as he proposes to narrow this group to former gang members who actively oppose gangs or to persons who (regardless of former gang association) work to help youths resist gang membership, the BIA's reasoning in *Matter of S-E-G-*, 24 I. & N. Dec. at 587, also relied on by the IJ here, explains why this does not assuage particularity and social-distinction concerns. In *Matter of S-E-G-*, the BIA acknowledged that "gangs such as the MS-13 retaliate against those who refuse to join their ranks." *Id.* Nevertheless, it concluded that this was insufficient to identify such persons as a particular social group because the grim reality in El Salvador is that "such gangs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power." *Id.* In short, persons who resist gang recruitment efforts in El Salvador are "not in a substantially different situation from anyone [else in that country] who has crossed the gang, or who is perceived to be a threat to the gang's interests." *Id.*

In *Matter of M-E-V-G-*, the BIA emphasized that *Matter of S-E-G-* "should not be read as a blanket rejection of all factual scenarios involving gangs" because "[s]ocial group determinations

33

are made on a case-by-case basis." 26 I. & N. Dec. at 251 (citing *Matter of Acosta*, 19 I. & N. Dec. at 233). To illustrate, it noted that "a factual scenario in which gangs are targeting homosexuals may support a particular social group claim." *Id.* Nevertheless, reiterating the critical point from *Matter of S-E-G-*, the BIA observed that the very prevalence of gang violence throughout a country—there, Honduras—while tragic, may make it difficult to secure relief from removal under provisions of law limited to protected classes. The Board explained that while "certain segments of a population may be more susceptible to one type of [gang] criminal activity than another," where "the residents all generally suffer from the gang's criminal efforts to sustain its enterprise," the "significant societal problems" that result may not support relief in the form of asylum or withholding of removal. *Id.* at 250–51. In such circumstances, it is up to Congress "to provide" other forms of "relief to those suffering from difficult situations not covered by asylum and withholding of removal." *Id.* (citing 8 U.S.C. § 1254a(a)(1) (providing temporary protected status for certain persons))[23]; *see also Melgar de Torres v. Reno*, 191 F.3d 307, 314 (2d Cir. 1999) ("[A] well-founded fear of persecution must be on account of an enumerated ground set forth in the [INA], and general crime conditions are not a stated ground.").

---

[23] In the past, the United States has designated El Salvador for Temporary Protected Status ("TPS"). *See Designation of El Salvador Under Temporary Protected Status Program*, 66 Fed. Reg. 14,214, 14,214 (May 9, 2001) (explaining TPS designation based on series of earthquakes); *Sanchez v. Mayorkas*, 141 S. Ct. 1809, 1812 (2021) (discussing same). More recently it has also designated Burma. *See* Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28,132, 28,133 (May 25, 2021) (explaining TPS designation based on "humanitarian crisis" resulting from military coup).

In sum, these precedents provide legal support for the IJ's decision to deny Quintanilla withholding of removal based on membership in his proposed social groups. Indeed, because the two cases cited by the IJ, *Matter of W-G-R-*, and *Matter of S-E-G-*, specifically addressed gang activities in El Salvador, the IJ's reliance on them raises no concerns akin to those identified in *Ordonez Asmen v. Barr*, 965 F.3d 128, 135 (2d Cir. 2020) (faulting agency's reliance on Salvadoran and Honduran perceptions of former gang members as identified in *Matter of W-G-R-* and *Matter of M-E-V-G-* without specifically considering Guatemalan society's perception of that group as it exists in Guatemala).

The requisite factual support for the IJ's decision is evident in Quintanilla's provision of only "scant evidence" to demonstrate the particularity or social distinction of the groups on which he now relies. *Matter of W-G-R-*, 26 I. & N. Dec. at 222. It is, of course, well established that "when a petitioner bears the burden of proof, his failure to adduce evidence can itself constitute the substantial evidence necessary to support the agency's challenged decision." *Shao v. Mukasey*, 546 F.3d 138, 157–58 (2d Cir. 2008) (internal quotation marks omitted).

Here, Quintanilla offered evidence of a government sponsored, privately-funded program to help persons remove gang tattoos. While that may be some evidence that the Salvadoran government views former gang members as socially distinct—at least to the extent that they were the primary beneficiaries of the tattoo-removal program—it does not compel the conclusion that Salvadoran society as a whole viewed gang members who participated in the program as socially distinct. *See generally Matter of M-E-V-G-*, 26 I. & N. Dec.

at 242.  The participation of a foreign non-profit organization in the program does not provide such evidence because how a group within a country is viewed by those outside its borders does not demonstrate domestic social distinction.[24]  Nor is the requisite social distinction established by reports of current gang members murdering past program participants.  Even if such uncorroborated hearsay reports sufficed to show that program participants were specific gang targets, "a persecutor's perception alone is not enough to establish a cognizable social group."  *Paloka v. Holder*, 762 F.3d at 101.

The same conclusion obtains insofar as Quintanilla stated at his reasonable fear interview that MS-13 had targeted his brother (who had never been a gang member), as well as himself, for their rehabilitation work with Iglesias Evangelicas.  The gang's hostile perception of persons doing rehabilitation work was insufficient, by itself, to compel the IJ to find that Salvadoran society as a whole viewed such workers as a socially distinct group.  *See id.*  While Quintanilla testified that his neighbors approved of his ministry, that evidence pertained to Quintanilla specifically and does little to answer the question of whether his neighbors—assuming *arguendo* that they can be viewed as a proxy for Salvadoran society as a whole—would perceive others performing similar work as part of a distinct social group.  *See Matter of W-G-R-*, 26 I. & N. Dec. at 217

---

[24] In *Oliva v. Lynch*, 807 F.3d 53, 61 (4th Cir. 2015), cited by Quintanilla in his reply brief, the Fourth Circuit faulted the BIA for failing to address whether "programs to help former gang members rehabilitate themselves" supported the social distinction criteria for a particular social group.  There, however, the government conceded that the agency had not considered Oliva's evidence and remand was, therefore, "the proper course of action."  *Id.*  That is not this case.

36

("[T]here must be evidence showing that society *in general* perceives, considers, or recognizes persons sharing the particular characteristic to be a group." (emphasis added)); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. at 244 ("Evidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like may establish that a group exists and is perceived as 'distinct' or 'other' in a particular society."); *cf. Lopez Canas v. Barr*, 787 F. App'x 32, 34 (2d Cir. 2019) ("[T]he recognition of friends and former coworkers is not an appropriate proxy for the perception of society as a whole.").

In sum, we conclude that the IJ *sua sponte* considered the social groups now identified by petitioner, and that his decision to deny withholding of removal based on social group is supported by both controlling law and substantial evidence.[25]

---

[25] The IJ seems to have found Quintanilla's withholding claim lacking not only at the cognizable-social-group step of the analysis but also at the nexus step. *See, e.g.*, App'x at 56 ("[I]t appears through the testimony of the respondent that the gang members that the respondent claims he fears are simply attempting to potentially enforce their code of conduct and punish infidelity to the gang."); *see also Matter of W-G-R-*, 26 I. & N. Dec. at 224 ("The respondent has not shown that any acts of retribution or punishment by gang members would be motivated by his status as a former gang member, rather than by the gang members' desire to enforce their code of conduct and punish infidelity to the gang."). Quintanilla presents no challenge to this nexus determination distinct from his claim that the agency failed to recognize his social groups. *See* Pet'r Reply Br. at 8. No matter. We have already explained why his social-group argument fails. And the IJ's adverse nexus conclusion is supported by substantial evidence unrelated to

## IV.    CAT Relief

Under Article 3 of the CAT, an alien cannot be removed "to a country where he more likely than not would be tortured by, or with the acquiescence of, government officials acting in an official capacity." *Mu Xiang Lin v. U.S. Dep't of Just.*, 432 F.3d 156, 159 (2d Cir. 2005); *see Scarlett v. Barr*, 957 F.3d at 334. An alien seeking CAT relief bears the burden of proving the likelihood of future torture by or with the acquiescence of government officials. *See* 8 C.F.R. § 1208.16(c)(2). "Torture" is "an extreme form of cruel and inhuman treatment," not "incidental to lawful sanctions," and "specifically intended to inflict severe physical or mental pain or suffering." *Id.* § 1208.18(a)(2), (3), (5). Acquiescence "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7); *see Pierre v. Gonzales*, 502 F.3d at 119 ("A private actor's behavior can constitute torture under the CAT without a government's specific intent to inflict it if a government official is aware of the persecutor's conduct and intent and acquiesces in violation of the official's duty to intervene." (emphasis omitted)). In considering a CAT claim, the agency properly considers "all evidence relevant to the possibility of future torture," including

---

Quintanilla's renunciation of his membership in MS-13 or his gang-opposition work with Iglesias Evangelicas. Specifically, Quintanilla's own statements acknowledge that (1) MS-13 members tried to kill him after accusing him of stealing a gang gun, and (2) the "main reason" he feared for his life if removed to El Salvador was because he had stabbed a gang leader. App'x at 411. These motives for gang violence, not based on Quintanilla's renunciation of or active opposition to MS-13, provided substantial evidence to support the IJ's adverse nexus determination.

38

evidence of "past torture"; of possible internal relocation; of "gross, flagrant or mass violations of human rights"; and any other relevant information regarding "conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3).

In rejecting Quintanilla's CAT claim, the IJ found that Quintanilla had not persuasively shown that Salvadoran government officials would commit or acquiesce in his torture because (1) Quintanilla had "indicated with specificity that he had not been harmed or beaten by the police" in the past; (2) MS-13 members were not themselves part of the Salvadoran government; and (3) the State Department Country Reports for El Salvador showed that, despite the country's high level of violence and instances of "police or military malfeasance," the government (a) was "embattled in trying to control gang activity in the country"; and (b) would not "turn a blind eye to harm of the respondent by gang members." App'x at 57–58.

Identifying no clear error in these findings, the BIA affirmed. *See Hui Lin Huang v. Holder*, 677 F.3d 130, 134 (2d Cir. 2012) ("[A]n IJ's finding that a future event will occur [is] fact-finding subject to review for clear error.").

In petitioning this court for review, Quintanilla faults the IJ for failing to reference his hearing testimony that, on three occasions, Salvadoran police tried to harm or kill him. We identify no error because the IJ detailed Quintanilla's numerous inconsistent statements about his encounters with Salvadoran police and determined from the occasion when he "indicated with specificity that he had not been harmed or beaten by the police" that he failed to demonstrate a likelihood of direct police torture. App'x at 57–58. The

BIA reached the same conclusion, even affording Quintanilla's testimony a presumption of credibility. Because the agency's conclusion finds support in record evidence, Quintanilla cannot secure CAT relief by pointing to conflicting evidence that might support—but not compel—a different conclusion. *See generally Joaquin-Porras v. Gonzales*, 435 F.3d 172, 181 (2d Cir. 2006) (observing that substantial evidence standard does not permit court to reverse agency ruling "simply because [it] disagree[s] with its evaluation of the facts" (internal quotation marks omitted)).

As for Quintanilla's claim that Salvadoran police would likely acquiesce in his torture by gang members, the BIA correctly observed that he offered no evidence to show that Salvadoran officials were aware of past gang attacks on his life. *See Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004) ("In terms of state action, torture requires . . . that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it."). Far from reporting the October 2015 gang attempt to beat him to death, Quintanilla falsely told the police that he had been the victim of a robbery. While a failure to ask for police help is not enough, by itself, to preclude a finding of acquiescence, *see Pan v. Holder*, 777 F.3d 540, 544–45 (2d Cir. 2015), where, as here, other evidence, specifically, State Department Country Reports, supports the agency's finding that the Salvadoran government is aggressively trying to combat gang violence, even through armed confrontations, we cannot conclude that the agency was compelled to find it likely that, if Quintanilla were removed to El Salvador, that country's officials would acquiesce in his torture by gang members.

40

In urging otherwise, Quintanilla argues that evidence of government efforts to combat gang violence does not preclude a finding of acquiescence where other evidence shows public officials condoning gang torture.[26] He is correct that a finding of acquiescence is not precluded in such circumstances. But neither is it compelled. Rather, it invites careful factfinding. Quintanilla argues that the IJ's factfinding on this point was defective because he overlooked evidence in the 2016 State Department Country Report indicating that corrupt Salvadoran officials acquiesced in torture. *See generally Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009) (observing that error of law may occur where agency "totally overlooked" or "seriously mischaracterized" record evidence). The argument is defeated by the record, which shows that the IJ considered the 2015 and 2016 State Department Country Reports and, in his decision, acknowledged their discussion not only of "the high level of violence and trouble that takes place in the country of El Salvador" but also of "reports on events involving police or military malfeasance." App'x at 58. At its core, then, what Quintanilla's argument seeks is for this court to reweigh facts showing that, on the one hand, El Salvador is trying to

---

[26] In support, he cites *De La Rosa v. Holder*, 598 F.3d 103, 110 (2d Cir. 2010). The case is distinguishable because, there, in vacating a denial of relief from removal based on a BIA finding that some evidence of police assistance precluded a showing of official acquiescence in torture, we observed that the government there was "admittedly unable to actually prevent the torture from taking place." *Id.* at 111; *see id.* at 110 ("Where a government contains officials that would be complicit in torture, and that government, on the whole, is admittedly incapable of actually preventing that torture, the fact that some officials take action to prevent the torture would seem n[ot] inconsistent with a finding of government acquiescence."). Quintanilla does not claim that the government of El Salvador "on the whole, is admittedly incapable of actually preventing" the gang torture that he fears on removal. *Id.* at 110.

combat gang violence but, on the other hand, some police and military malfeasance hampers those efforts, and to accord the latter more weight than the former. But substantial evidence review does not contemplate any judicial reweighing of evidence. Rather, it requires us to ask only whether record evidence compelled an acquiescence finding different from that reached by the agency. We conclude that it did not.

Finally, Quintanilla argues that the government's acquiescence in torture is evident from its turning a blind eye to the risk of gang torture resulting from its publication on social media of Quintanilla's participation in a gang-tattoo-removal program. In reviewing this argument, we assume certain facts in the light most favorable to Quintanilla: (1) that the Salvadoran government sanctioned the challenged publication, (2) that such publication breached a program promise of confidentiality, and (3) that gangs had killed other program participants. Nevertheless, we conclude that these circumstances did not compel the IJ to find it likely that, if Quintanilla is removed to El Salvador, government officials will acquiesce in his torture.

*First*, there is no evidence that any government official who sanctioned publication acted from more than mistake or negligence about any attendant risk. *See* 8 C.F.R. § 1208.18(a)(7) (stating that mistake, negligence, or even reckless disregard of truth are insufficient to demonstrate "acquiescence" in torture). *Second*, insofar as Quintanilla identified the gang's October 2015 beating as past torture supporting his CAT claim, that attack occurred over four years after publication of his participation in the tattoo program. During those years, Quintanilla managed to avoid gang torture by paying

42

extortion and storing gang guns. He was beaten only when gang members accused him of stealing a gun. *Third*, and as already noted, State Department Country Reports indicated that the Salvadoran government was actively trying to curtail gang violence. On this record, we cannot conclude that the IJ was compelled to find that government officials would acquiesce in gang torture of Quintanilla upon his removal to El Salvador.

## CONCLUSION

To summarize, we conclude as follows:

(1) Any failure by the IJ to make an explicit adverse credibility finding does not require remand because the BIA explicitly afforded Quintanilla's testimony the presumption of credibility provided in 8 U.S.C. §§ 1158(b)(1)(B)(iii) & 1231(b)(3)(C), and, nevertheless, found it insufficient to support withholding of removal.

(2) The IJ *sua sponte* considered the two social groups identified by Quintanilla on this appeal—"former gang members who actively distance themselves from the gangs and work to oppose them" and "individuals working in El Salvador to rehabilitate youth in order to prevent their joining gangs"—and substantial evidence supports the agency's conclusion that neither group possessed the particularity or social distinction necessary for withholding of removal.

(3) Substantial evidence, including State Department Country Reports, supports the agency's determination that Quintanilla failed to show that, if removed to El Salvador, he would likely face torture from government officials or

from gangs acting with the acquiescence of government officials.

Accordingly, we DENY Quintanilla's petition for review of the challenged decisions. Quintanilla's stay of removal is hereby VACATED as moot.