24-115 (L)
Villalta Martinez v. Bondi

BIA
Schultz, IJ
A201 517 860

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of July, two thousand twenty-five.

PRESENT:
> JON O. NEWMAN,
> WILLIAM J. NARDINI,
> SARAH A. L. MERRIAM,
> *Circuit Judges.*

_____

JOSE SAUL VILLALTA MARTINEZ,
> *Petitioner,*

v.

PAMELA BONDI, UNITED STATES ATTORNEY GENERAL,
> *Respondent.*

24-115 (L); 24-1222 (Con)

NAC

_____

| | |
|---|---|
| **FOR PETITIONER:** | Aaron J. Aisen, Esq., Erie County Bar Association Volunteer Lawyers Project, Inc., Batavia, NY. |
| | |
| **FOR RESPONDENT:** | Brian M. Boynton, Principal Deputy Assistant Attorney General; Ilana J. Snyder, Senior Litigation Counsel; Timothy Bo Stanton, Senior Trial Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, DC. |

UPON DUE CONSIDERATION of this petition for review of decisions of the Board of Immigration Appeals ("BIA"), it is hereby ORDERED, ADJUDGED, AND DECREED that the lead petition for review is GRANTED and the case is REMANDED, and the consolidated petition is DISMISSED as moot.

Petitioner Jose Saul Villalta Martinez, a native and citizen of El Salvador, seeks review of a (1) January 12, 2024, decision of the BIA vacating a September 15, 2023, decision of an Immigration Judge ("IJ") that granted his claim for relief from removal under the Convention Against Torture ("CAT"), *In re Villalta Martinez*, No. A201 517 860 (B.I.A. Jan. 12, 2024), *rev'g* No. A201 517 860 (Immig. Ct. Batavia Sept. 15, 2023), and (2) the BIA's April 12, 2024, decision denying his motion to reconsider, *In re Villalta Martinez*, No. A201 517 860 (B.I.A. Apr. 12, 2024). We assume the parties' familiarity with the underlying facts and procedural history.

2

Under these circumstances, we have reviewed the BIA's decision denying CAT relief. *See Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005).

## I.     Standard of Review

The BIA "will not engage in de novo review of findings of fact determined by an [IJ]. Facts determined by the [IJ], including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the [IJ] are clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). Clear error review "plainly does not entitle a reviewing court [or the BIA] to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)). Examples of clear error include when "[t]here might be no evidence at all to support a finding of fact. . . . Or the finding might be controverted by indisputable evidence." *Id.* "A more likely example might arise where an IJ has obviously misunderstood the testimony of a witness and based a finding of fact on that misunderstanding. Situations might also arise where the evidence opposed to the claimant's version, though not indisputable, has overwhelming persuasive force." *Id.* "What is not in doubt, however, is that the phrase 'clear error' is to be taken literally: the error must be clear." *Id.* Clear

3

error review "is less deferential to a factfinder than 'substantial evidence' review"; thus, "even if there is substantial evidence to support a finding of fact, . . . the BIA can conclude, with sufficient justification, that a 'clear error' has been committed." *Id.* at 127–28. "If the findings of fact are against the clear weight of the evidence" or if on appeal, the BIA "otherwise reaches a definite and firm conviction that a mistake has been made by the [factfinder]," it "will set the findings aside even though there is evidence supporting them that, by itself, would be considered substantial." *Id.* at 128 (quotation marks omitted).

"The BIA's application of 'clear error' review is the application of a legal standard to findings of fact and as such is a ruling of law" that we review *de novo*. *Id.* at 129. "However, *de novo* review does not mean that we can redetermine *de novo* whether we think the IJ has committed clear error. It means that we must determine whether the BIA has provided sufficient justification for its conclusion that the IJ has committed clear error" and "that we must make sure that the BIA has not violated the prohibition against making its own findings of fact." *Id.* The BIA must supply "cogent reasons for its rulings." *Id.* We will remand if the BIA has given "no explanation for why it rejected the IJ's reasons," has "started anew, conducting its own . . . analysis," has "engaged in impermissible

4

factfinding," or where it has not given sufficient justification for its findings of clear error. *Id.* at 130–31 (quotation marks omitted).

## II. CAT Relief

An applicant for CAT relief has the burden to prove he will "more likely than not" be tortured "by, or at the instigation of, or with the consent or acquiescence of, a public official." 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1). The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured." *Chun Gao v. Gonzales*, 424 F.3d 122, 128–29 (2d Cir. 2005) (quotation marks omitted). When determining the likelihood of future torture, the agency considers "[e]vidence of past torture inflicted upon the applicant," "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal," and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3). "Barbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering . . . is to illicitly discriminate, punish, coerce confessions, intimidate, or the like." *Pierre v. Gonzales*, 502 F.3d 109, 121 (2d Cir. 2007).

5

We remand because the BIA did not provide sufficient justification for its conclusions that the IJ clearly erred in finding that Villalta Martinez would more likely than not be tortured and that there was government intent to torture. *See* Cert. Admin. R. ("CAR")[1] at 33 (BIA Dec.); *see also Wu Lin*, 813 F.3d at 131. "On remand, the BIA will have to either accept the IJ's findings or, if it can, provide a supportable basis for rejecting them." *Wu Lin*, 813 F.3d at 131.

## A. Dr. Boerman's Testimony

The first justification the BIA gave for finding clear error in the IJ's decision is that "[t]he testimony from Dr. Boerman, considered with other evidence of record, is insufficient to show that the respondent is more likely than not to be tortured if returned to El Salvador." CAR at 33. In reaching this conclusion, the BIA reasoned: "As determined by the Immigration Judge, Dr. Boerman's testimony . . . was entitled to diminished weight because [he] did not recall if he analyzed documents relevant to the respondent's particular claim, and he did not interview the respondent." *Id*. But the IJ did not "fully discount" Dr. Boerman's testimony because he was qualified as an expert on El Salvador, the state of

---

[1] All record citations are to the CAR in 2d Cir. 24-1222.

6

exception,[2] and its application to possible gang members, but concluded that his testimony deserved "probative weight," especially as his testimony was "in many ways verified and validated by other sources in th[e] record." *Id.* at 113–14 (IJ Dec.). The BIA's conclusion that Dr. Boerman's testimony was entitled to diminished weight because he did not interview Villalta Martinez or recall if he reviewed Villalta Martinez's written statements, *see* CAR at 33, does not justify finding clear error absent consideration of other country conditions evidence that corroborated Dr. Boerman's testimony.

## B.    Tattoos and criminal convictions

Dr. Boerman may not have reviewed Villalta Martinez's asylum application, but he did review Form I-213, in which the Department of Homeland Security identifies Villalta Martinez's tattoos and criminal conviction. *Id.* at 247 (Tr.), 646 (Aff.), 701–03 (I-213). Thus Dr. Boerman did not need to review Villalta

---

[2] The "régimen de excepción" or state of exception, enacted in March 2022, is a national law of El Salvador under which known or suspected gang members are arrested and imprisoned. CAR at 505 (2022 State Dep't Report) ("Under the state of exception, which must be renewed monthly, security forces were empowered to arrest anyone suspected of belonging to a gang or providing support to gangs."); *see also* https://www.elsalvadornow.org/2025/05/30/state-of-exception-extended-39-times-regimen-de-excepcion-prorrogado-39-veces/ (extended 39 times, now until July 4, 2025).

Martinez's asylum application to determine whether he would more likely than not be subject to imprisonment under the state of exception based on his tattoos and conviction. As Villalta Martinez argues, the BIA failed to consider country conditions evidence corroborating Dr. Boerman's testimony that the tattoos alone are a basis for Villalta Martinez to be targeted under the state of exception, and that being so targeted exposed him to a likelihood of torture. *See, e.g.*, CAR at 445–57 (2022 The Intercept Report) (describing deportation and eventual disappearance in prison of a man with an MS tattoo who had been out of the gang for 15 years), 512 (2022 State Dep't Report) ("[S]ecurity forces frequently arrested persons for gang membership based solely on anonymous denunciations through a government hotline, for having tattoos, or for having any prior contact with the criminal justice system.").

The agency is required to consider the risk of torture in the aggregate. 8 C.F.R. § 1208.16(c)(3). Although the BIA considered conditions in prisons for suspected gang members under the state of exception, it did not appear to consider the risk that Villalta Martinez would be a target for police and other authorities because of his visible tattoos, or that risk in combination with country conditions

8

evidence that his tattoos could lead to his disappearance or murder by authorities. *See* CAR at 33–35.

### C.  Suspension of due process rights, including pervasive impunity for extrajudicial killings

While the BIA discounted Dr. Boerman's testimony and report, the IJ credited it because it was also supported by other evidence. *See id.* at 33–35, 113–14. Dr. Boerman testified, in part, that the state of exception entailed a complete curtailment of due process rights, including that suspected gang members could be killed or tortured without trials. *See id.* at 245 (Tr.).

There is record support for Dr. Boerman's testimony that the state of exception has resulted in the suspension of due process rights, including that suspected gang members are killed without trial. *See id.* at 416–17 (2022 ElSalvador.Com Report) (indicating that the Attorney General "will not prosecute police or military personnel involved in the deaths of gang members in clashes and in the line of duty"), 431 (2020 Human Rights Watch Report) ("pervasive impunity" for state actors as perpetrators of harm), 435 (witnesses attesting to police moving bodies and hiding evidence), 505 (2022 State Dep't Report) ("[T]he state of exception suspended the rights to be informed immediately of the reason

9

for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association. . . .   Significant human rights issues included . . . unlawful or arbitrary killings; forced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by security forces; . . . arbitrary arrest and detention; . . . [and] arbitrary or unlawful interference with privacy. . . .   [I]mpunity persisted in the security forces."), 511 ("[I]n practice, security forces were no longer required to have warrants prior to making arrests or entering homes to make arrests."), 512 (police officers were "pressured to give false testimony to incriminate detainees and to reach a daily quota of arrests," and the founder of the police union, after complaining that police were forced to make arbitrary arrests, "was arrested and held for four days on charges of 'apologizing for crime'").   Given that this evidence is relevant to the risk of torture, *see* 8 C.F.R. § 1208.16(c)(3), and the IJ credited Dr. Boerman's testimony as validated by evidence in the record, *see* CAR at 113–14, the BIA's decision to discount his testimony without considering this evidence is an insufficient justification for its clear error finding.

**D.     State-sponsored systematic infliction of torture**

Dr. Boerman emphasized that, while Villalta Martinez faced a risk of harm from the gangs themselves (including within and outside the prisons), "the greatest risk to [him] is from the Salvadoran government." *Id.* at 252 (Tr.). "[T]here have been 174 documented in-custody deaths . . . [in] less than 18 months." *Id.* at 252–53. "[T]he majority of [these deaths] show[ed] signs of torture." *Id.* at 253. And there was further "documented systematic massive torture and in-custody killings." *Id.* According to the "former inspector general for the National Police," the police used "routine beatings" that were "ritualistic" for everyone who enters the prison system. *Id.* at 273, 280.

Again, Dr. Boerman's testimony is supported by other evidence in the record, and the BIA's conclusion that he provided only generalized or anecdotal evidence is an insufficient justification to support its determination that the IJ clearly erred. *See id.* at 33–34. The record includes evidence of specific instances of torture and low-value statistics. *See, e.g.*, *id.* at 413–14 (2022 ElSalvador.com Article reporting 306 cases of torture, and describing the beating and simulated drowning of a 14-year old boy accused of gang membership), 455 (2022 The Intercept Report) ("[T]he few people released from prisons – mostly minors – have

11

shown signs of being beaten, starved, and medically neglected," with some "show[ing] signs of torture."), 581 (2022 Amnesty Int'l Report describing the "repeated[] torture[]" of a 16-year old boy by fellow cell-mates, condoned by prison officials), 585–86 (2022 Inter Press Service Report describing a man falsely accused of gang membership who was tortured and killed in custody).

But the record also includes evidence contrary to the BIA's conclusion that reports of torture are anecdotal. *See, e.g.*, *id.* at 423–24 (2020 Human Rights Watch Report) (stating that 138 murders of deportees from the United States, including by police and state actors, is the "tip of the iceberg"), 439 (2022 Human Rights Watch Report) ("These human rights violations include arbitrary arrests, enforced disappearances, torture and other ill-treatment of detainees, and significant due process violations. In addition, the circumstances of many deaths in custody during the state of emergency suggest state responsibility for those deaths."), 440 (stating that these "human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country . . . by both the military and police"), 560–61 (2022 Washington Office on Latin America Report) ("Stigmatization, persecution and repression have not been isolated actions, but are . . . carried out in a systematic manner. . . . Arbitrary

12

detentions and torture in prisons have occurred in a systematic, generalized, and massive manner."). The BIA failed to address this evidence, and accordingly its conclusion regarding the likelihood of torture is insufficiently justified.

### E.    Overcrowding and starvation

The record also contains evidence that the government is intentionally subjecting detainees to overcrowding and starvation within the prisons, which (as Villalta Martinez argues) the BIA ignored. Overcrowding in one prison "rife with allegations of abuse, torture, and death" has "hit nearly 250 percent." *Id.* at 453 (2022 The Intercept Report). More recent reporting reflects prisons at three to six times their capacity. *See id.* at 461 (2023 Human Rights Watch Report). The 2022 State Department Report confirms these figures and adds that "80 prisoners [were] held in cells built for 12," with "insufficient room to lie down." *Id.* at 509; s*ee also id*. at 505 (detailing "credible reports of: . . . harsh and life-threatening prison conditions"). "There is extreme overcrowding in the prisons which has led to deplorable conditions. Local human rights organizations have documented a lack of basic necessities such as access to clean water, sanitary services, and sufficient food in decent condition. There has also been a complete lack of

13

medical attention for people detained who are in need of medicine for preexisting conditions." *Id.* at 560 (2022 Washington Office on Latin America Report).

As Villalta Martinez argues, the record also contains evidence that these conditions are intentional, and the BIA did not address this evidence before reaching a conclusion contrary to the IJ's regarding intent. "From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members." *Id.* at 509 (2022 State Dep't Report). President Bukele has tweeted that "none of [the gang members] will ever get out," *id.* at 358 (2022 El Pais Report), and he has ordered that prisoners "do not see sunlight," *id.* at 364. He has also cut prisoner rations to two meals a day, specifically threatening: "I swear to God, [prisoners] won't eat a grain of rice, and let's see how long they last." *Id.* at 453 (2022 The Intercept Report); *see also id.* at 509 (2022 State Dep't Report) ("A released prisoner reported he received four ounces of rice and one tortilla per day."). These public statements, among others, furnish some evidence indicating a specific intent to torture suspected gang members. Thus, the BIA's conclusion, contrary to the IJ's, is insufficiently justified as it does not account for or address this evidence of intent.

14

## F. Lack of Complete Information

The BIA also justified its decision by noting that Dr. Boerman "did not have complete information regarding the prevalence of harm in Salvadoran detention facilities." *Id.* at 33. Dr. Boerman repeatedly emphasized that the available statistics were inherently limited given the current totalitarian regime. *See, e.g., id.* at 267-69 (Tr.). And there is evidence to support that position. President Bukele reported "zero homicides," apparently removing "the deaths of alleged gang members in confrontations with the police." *Id.* at 558 (2022 Washington Office on Latin America Report). Bukele has "dismantl[ed] . . . democratic institutions" and "has left virtually no independent government bodies that can serve as a check on the executive branch." *Id.* at 442 (2022 Human Rights Watch Report); *see also id.* at 505 (2022 State Dep't Report) (detailing "credible reports" of "serious problems with the independence of the judiciary" and "serious restrictions on free expression and media, including censorship and threats to enforce criminal laws to limit expression"). Bukele has "undermined transparency and accountability, including by weakening the agency in charge of ensuring access to public information." *Id.* at 442; *cf. id.* at 559 (2022 Washington Office on Latin America Report) ("The members of the Institute of Access to Public

15

Information do not fulfill their role of overseeing transparency and publicity since they are close to the ruling party."). Bukele has imposed a "gag order" on reporting on abuses in the prisons, which can result in journalists being jailed for up to 15 years, and only media "aligned with the administration" are allowed in prisons. *Id.* at 454–55 (2022 The Intercept Report); *see also id.* at 517 (2022 State Dep't Report) (asserting that the law "effectively prohibits reporting on gang-related issues"). Again, given this evidence, the BIA did not sufficiently justify its conclusion that Dr. Boerman's lack of complete information was a basis to find clear error in the IJ's decision.

Lastly, as to El Salvador's Human Rights Ombudsman, whom the BIA cites for the conclusion that the "treatment" of detainees was not "beyond what was allowed by law," *id.* at 34 (citing *id.* at 509–540 (2022 State Dep't Report)), the Ombudsman's "office itself was . . . denied access to the prisons to investigate . . . arrests and the conditions," *id.* at 278 (Tr.); *accord id.* at 507, 510 (2022 State Dep't Report) (stating the same, and that the Ombudsman was not "an independent defender of human rights"). Moreover, the "regulations do not exempt from the definition of torture those sanctions that defeat the object and purpose of the [CAT]," such as those that are "brutal and highly disproportionate to the

penological purpose for which they are imposed." *Galina v. Wilkinson*, 988 F.3d 137, 142 (2d Cir. 2021) (footnote and quotation marks omitted); *see also Pierre*, 502 F.3d at 121 ("[L]ive burial would be torture even if somewhere it were the lawful sanction for an offense.").

In sum, remand is warranted here because the BIA gave insufficient justification for its clear error finding. The BIA's conclusion that Dr. Boerman's testimony is generalized or anecdotal fails to consider that his testimony was validated by various sources in the record that report intentional and systematic torture, including by beating and killing suspected gang members in and outside of prisons, and by starving prisoners and subjecting them to life-threatening prison conditions. The BIA also did not grapple with evidence that the government has suppressed public information of its actions.

Because we are remanding, we dismiss as moot Villalta Martinez's consolidated petition challenging the subsequent denial of reconsideration. *See Aliyev v. Mukasey*, 549 F.3d 111, 119 (2d Cir. 2008) (granting petition for review of BIA's final order of removal and dismissing as moot petition for review of BIA's denial of reconsideration).

For the foregoing reasons, the lead petition for review is GRANTED and the case is REMANDED to the BIA for further consideration, and the consolidated petition is DISMISSED as moot. All pending motions and applications are DENIED and stays VACATED.

FOR THE COURT:
Catherine O'Hagan Wolfe,
Clerk of Court